UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Newport News Division*

JOANN WRIGHT HAYSBERT,

        **Plaintiff,**

v.                              Civil Action No.: 4:24-CV-87

OUTBACK STEAKHOUSE OF
FLORIDA, LLC, AND
BLOOMIN' BRANDS, INC. et al.,

        **Defendants.**

## PLAINTIFF'S UPDATED PRETRIAL BRIEF REGARDING THE ADMISSIBILITY OF DR. AARON FILLER'S EXPERT OPINIONS

COMES NOW, Plaintiff, JoAnn Wright Haysbert, by counsel, and submits the following updated Pretrial Brief regarding the admissibility of Dr. Aaron Filler's Expert Opinions, stating as follows:

During the first trial, Defendants objected to the admissibility of the testimony of Dr. Aaron Filler, M.D., Ph.D., a world-renowned neurosurgeon and one of Plaintiff's medical experts. In particular, Defendants argued that Dr. Filler made no opinion as the cause of Plaintiff's brain injury; that Dr. Filler lacked a foundation to offer an opinion on causation; that any opinion Dr. Filler offered would be speculative; and that Dr. Filler failed to rule out other possible causes of Plaintiff's injuries. They also argue that Dr. Filler offered no opinion with respect to the symptoms that Plaintiff is experiencing as a result of her brain injury. *See* Defendants' Trial Brief as to the Admissibility of Dr. Filler [ECF No. 294] ("Defs' Filler Br.").

Dr. Filler explained during the Court's preliminary hearing into these objections, and moreover, as the Court stated in response to Defendants' objections at trial, "you are certainly able… to cross-examine Dr. Filler, and you can bring up all of these points on cross-

examination." Transcript of Proceedings, Day 3, Aug. 10, 2023 [ECF No. 295] ("Tr.") 443: 22-24.

I. **ARGUMENT**

Defendants have argued that "Dr. Filler never examined Plaintiff" and "never interviewed Dr. Haysbert to take a history and physical." See Defs' Filler Br. at 2, 4. They also quote the 4th Circuit's statement in Cooper v. Smith & Nephew, 259 F.3d 194, 200-01 (4th Cir. 2001), that a "reliable differential diagnosis typically, though not invariably, 'is performed after physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests.'" Defs' Filler Br. at 4. This argument is flawed because Plaintiff suffered traumatic brain injuries, not a sprained ankle. Brain injuries cannot be diagnosed, nor their cause determined, from a physical or in-office examination. What Dr. Filler did do is what thousands of neurologists and neurosurgeons do every day: he reviewed the medical imaging performed on Dr. Haysbert's brain, as well as the indications provided by the referring physician. Tr. 416:12-13, 424:16-17, 410:25-411:9.

Under Federal Rule of Evidence 702, a witness may offer an expert opinion if three conditions are met: (i) the witness is qualified based on knowledge, skill, experience, training, or education; (ii) the testimony is relevant and helpful to the jury; (iii) the testimony has a sufficient factual basis; and (iv) the testimony is based on reliable principles and methods, reliably applied to the facts of the case. As explained below, Dr. Filler's proposed testimony meets each of these requirements and Defendants' arguments to the contrary are meritless.

A. *Dr. Filler is Qualified to Offer an Expert Opinion*

Defendants rightly do not object to Dr. Filler's qualifications to offer an expert opinion. Dr. Filler has a medical degree from the University of Chicago and a Ph.D. in biological

anthropology from the University of Chicago. He completed a post-graduate residency in neurosurgery and fellowships in neuroimaging, complex spinal surgery, and peripheral nerve surgery. He has held academic appointments at the University of London, UCLA Medical Center, University of Washington, Century City Hospital, and Cedars Sinai Medical Center. He is a Diplomate of the American Board of Neurological Surgery and a Fellow of the Royal College of Surgeons of England and the Intercollegiate Board in Surgical Neurology of England, Ireland, Edinburgh, & Glasgow, as well as a past president of the Society for Brain Mapping and Therapeutics. He is also a Lt. Col. (ret.) in the U.S. Army Reserves Medical Corps, having served as commander of the 1466th Med Team, Neurosurgery. Dr. Filler is also the inventor of Diffustion Tensor Imaging ("DTI"), the technology used for analyzing the MRI images of Dr. Haysbert's brain.

   B. *Dr. Filler's Testimony is Relevant and Helpful to the Jury*

  To prove her case, Plaintiff must show a causal chain from Plaintiff's fall to her injuries. As Defendants point out, demonstrating causation often requires an expert medical witness. See Defs' Filler Br. at 3. It follows that an expert opinion on causation would therefore "help the trier of fact to understand the evidence or to determine a fact in issue."

  Defendants assert, however, that Dr. Filler offered no opinion on causation whatsoever. Defs' Filler Br. at 1. Pointing to Dr. Filler's references to the "expected" effects of certain physical abnormalities he observed in Plaintiff's brain, Defendants object that Dr. Filler refers only to "statistically possible conditions which may be present," Tr. 406:6-9, and that references to expected effects "are [only] a theory, not confirmed by physical examination or interview of the patient or review of any other healthcare providers' records." Tr. 407:3-7. Defendants further characterize Dr. Filler's testimony in this regard as "expressions of possibility, not probability."

3

Defs' Filler Br. at 2 (quoting <u>Vilseck v. Campbell</u>, 242 Va. 10, 14 (1991) (emphasis added by Defendants).[1] These assertions are not accurate. As Dr. Filler explained in his testimony, his opinions are not merely expressions of possibility. His conclusions were reached to a "reasonable degree of medical certainty," but because his report was prepared as a medical document rather than a legal one, he used medical, rather than legal, terminology. Tr. 422:20-25; <u>see also</u> <u>Vilseck</u>, 242 Va. at 13 ("In this area of law, we deal in terms of proof with reasonable certainty") (quoted approvingly in Defs' Filler Br. at 2). Dr. Filler went on to explain the terms he used: "could," he explained "means it's a possibility," while "would be expected to" means that the image finding is "more likely than not" to be the cause of a symptom. Tr. 422:25-423:9.

With respect to Plaintiff, Dr. Filler explained that he observed a particular traumatic injury to Plaintiff's fornix that he described as "pathognomonic," Tr. 419:1-14, meaning specifically characteristic of a particular condition or disease. <u>See also</u> Tr. 415:14-16 (Dr. Filler explaining that pathognomonic means that "you see that, it must be a certain type of cause and effect"). In other words, the injury to Dr. Haysbert's fornix that Dr. Filler observed is characteristic of trauma, rather than any sort of chronic condition. Specifically, he explained that the traumatic brain injury he observed is pathognomonic of a "lateral impact trauma" and that "there is nothing else that will cause exactly that" type of fornix injury. Tr. 430:8-16.

Contrary to Defendants' contention, Dr. Filler did offer an opinion as to the cause of Plaintiff's brain injury: the slip-and-fall at Outback Steakhouse, reasoning that (1) it was unlikely this injury existed prior to Plaintiff's fall because the injury is inconsistent with her ability to

---

[1] Defendants' suggestion of a similarity between this case and <u>Vilseck</u> is misplaced. <u>See</u> Defs' Filler Br. at 2. In that case, the plaintiff provided no evidence to establish a causal connection between the accident and the development and removal of the tumor because the plaintiff, who is a physician, "did not say during his testimony that the accident caused the tumor, and not one of the physicians he consulted took the stand and testified there was a causal connection." <u>Vilseck</u>, 242 Va. at 14.

4

perform her job duties at the level that she was prior to the fall and (2) that the onset of Plaintiff's neurological symptoms coincided with her fall. Tr. 421:2-423:8. Dr. Filler also noted that "[t]he standard in medicine does not require us to have a prior image in order to interpret a current image," Tr. 462:19-20, and that "in medicine, we do not say [that] we are not allowed to interpret anything unless we had a prior preinjury [image] because we'd have to go around and image everyone in the world in case they have an injury sometime." Tr. 463:1-4.

Defendants also incorrectly claim that Dr. Filler offered no opinions as to the cause of Plaintiff's symptoms. In fact, Dr. Filler has explained that, in his opinion, the brain injury suffered by Plaintiff when she fell is the cause of the neurological symptoms she reported. For example, as Dr. Filler testified, "with regard to the fornix injury, I say it will have the expected effects of impairment of the memory formation. And in -- the way I would write in different formats, that medically is as strong or stronger than saying reasonable degree of medical probability, not an extreme degree of medical probability or absolute…" Tr. 426:19-25; see also Tr. 484:2-6 (describing his finding as "that, to a reasonable degree of medical certainty, that fall caused the image or concussion, is the cause of this damage, and this will explain the concussive symptom.").

   C. *A Foundation Exists For Dr. Filler's Causation Opinions*

Defendants also suggest that Dr. Filler's testimony is without foundation because he "never examined Plaintiff, never interviewed her, never reviewed any of her medical records, nor reviewed her deposition testimony." Defs' Filler Br. at 2. It was true that at the time of the filing of Defendants' Brief, Dr. Filler had not interviewed or seen Plaintiff, or review all of her medical records[2]. As he explained at trial, however, "I examined her brain," Tr. 416:1, or, more

---

[2] This is no longer the case and Plaintiff intends to supplement discovery in this regard.

5

specifically, "I examined her brain image." Tr. 416:12-13. "When I image a patient, I am examining them." Tr. 424:16-17.  Dr. Filler also obtained clinical information from Dr. Huma Haider at the National Brain Injury Institute, who did interview Plaintiff and perform a comprehensive evaluation based on Dr. Filler's instructions. As Dr. Filler explained, in his own clinical practice he typically relies on a referring physician for clinical information, rather than seeing a patient in person himself. Tr. 410:25-411:9; see also Tr. 484:12-16 ("You don't send a patient down to the radiologist saying, I'm not going to tell you what's wrong with him, image the whole body and see what you find. We don't do that because it won't result in useful information.").

Rule 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Here, it was perfectly appropriate for Dr. Filler to rely on Dr. Haider's report, regardless of whether it was admissible, because a referring doctor's report is typical of what medical experts would rely on. See Tr. 435:9-22.

The Court's primary concern at the time was that Dr. Filler's report, in its view, did not indicate that he had relied on Dr. Haider's evaluation. Tr. 441:10-25.[3] Dr. Filler's initial report in fact identified Dr. Haider as the referring physician. But to the extent that Dr. Filler's report was unclear about his reliance on Dr. Haider's clinical evaluation of Plaintiff, Dr. Filler will supplement his report pursuant to Fed. R. Civ. P. 26(e)(2).[4]

---

[3] The Court also expressed concern that Defendants could not cross-examine Dr. Haider's report. Tr. 442:1-9. Although this concern is at odds with what Rule 703 allows, Plaintiff notes that Defendants did have the opportunity to depose Dr. Haider, but elected not to do so.

[4] Dr. Filler's supplemental report will also indicate that he reviewed Plaintiff's deposition testimony, which was inadvertently omitted.

Additionally, it is not at all uncommon for an expert witness to rely only on medical records, especially defense experts. Although the Rules of the Virginia Supreme Court allow for an adverse party to move the court to compel that a party "submit to a physical or mental examination by one or more health care providers, as defined in § 8.01-581.1 , employed by the moving party or to produce for examination the person in the party's custody or legal control" (see Rule 4:10(a), R. S. Ct. Va.), in many instances, the health care provider will simply conduct what is often referred to as a "medical record review."   This evidence is admissible, although subject to cross-examination.

> D.    *Dr. Filler's Testimony is Reliable*

Defendants do not challenge the reliability of the DTI methodology relied upon by Dr. Filler for his assessment. Nor realistically could they because, as Dr. Filler pointed out, DTI studies "are pretty much universally being accepted in court." Tr. 429:16-21.[5]

Defendants nevertheless assert that any opinion Dr. Filler offered would be speculative and, furthermore, that Dr. Filler allegedly did not "rule anything out" and "merely stated that Plaintiff's imaging 'are consistent with the mechanics of trauma as described.[']" Defs' Filler Br. at 3-4. They further assert that Dr. Filler improperly "rel[ied] on temporal proximity" and invoke the *post hoc ergo propter hoc* fallacy.[6]

As explained above, there is nothing speculative about Dr. Filler's opinion, which was reached to a "reasonable degree of medical certainty" based, among other things, on the pathognomonic nature of the observed injury. And reliance on a patient's reported symptoms after an event to determine whether the event caused the symptoms is standard medical practice.

---

[5] DTI, as Dr. Filler explained, is an "advanced type of MRI" that "allows us to actually see the signs of concussion in the brain which are invisible in all other methods." Tr. 450:14-18.
[6] Defendants also nitpick at the fact that Dr. Filler's report describes Plaintiff as falling after "she got up from the table." Defs' Filler Br. at 1 n.1; Tr. 406:4-5.

*See* Tr. 482:16-20 ("Patient comes to the emergency room, has a symptom. We order a test for that symptom. The imaging doctor says, oh, patient complaining of this, I did the test, here's my finding, yeah, we all agree this explains the symptom in the light of what happened."). Contrary to Defendants' assertions Dr. Filler certainly ruled out other causes of Plaintiff's brain injury, explicitly stating that Plaintiff's brain injury "did not come from old age" and could not have come from "some sort of gradual process over time." Tr. 430:17-22. Rather, this injury to Plaintiff's brain could only have come from a "sudden traumatic event," such as a fall. Tr. 475:10-15.

      Dr. Filler also did not rely only on "temporal proximity." Instead, as explained, he relied on the differences in Dr. Haysbert's capabilities before and after her fall, the onset of her neurological symptoms, and the fact that the injury to her brain could only have come from a certain kind of trauma. Dr. Filler also explained how his reached his conclusions about Plaintiff's symptoms from the DTI imaging:

> [I]f someone is having trouble walking, and the x-ray shows they have a broken femur, I can understand why they are having trouble walking. We can see a tract that's broken, part of the brain in that tract is not working properly. It's that level of detail
>
> ...
>
> [I]f a person has clearly a new symptom, and the new symptom correlates with a new finding, just like, again, developing in your arm, and I get an MRI, and there's a tumor there. I can say, well, the tumor is probably causing your pain, even though I didn't have an MRI before that showed they didn't have the tumor before. We have to make a reasonable medical inference."

Tr. 460:12-16, 460:21-461:2.

      Defendants also point out that after her slip-and-fall, Plaintiff underwent a CT scan from which she was diagnosed with a cerebral aneurysm and that Plaintiff also suffered from

hypertension for a number of years. Defs' Filler Br. at 3. They further claim that Dr. Filler was unaware of these facts. *Id*. This argument does not undercut the reliability of Dr. Filler's testimony in any way. Plaintiff underwent the CT scan after a car accident in April 2021, whereas the slip-and-fall occurred in May 2018 and the imaging utilized by Dr. Filler performed on September 18, 2020. Defendants fail to explain why a later-in-time CT scan should undermine the basis for Dr. Filler's analysis of Plaintiff's DTI images. Nor do they explain why a hypertension diagnosis or a prior aneurysm would do so either. As a neurosurgeon, Dr. Filler is undoubtedly able to tell the difference between an aneurysm, the effects of hypertension, and a traumatic brain injury. And, as Dr. Filler testified, DTI can pick up brain injuries that could not be seen on a CT scan, Tr. 457:21-24, and the DTI images of Plaintiff's brain showed a traumatic injury consistent with a fall, not anything associated with old age or any type of gradual process. Dr. Filler's proposed expert testimony meets the requirements of Rule 702 and should be admitted.

WHEREFORE, all of the foregoing reasons and for such reasons as may be articulated during oral argument, Plaintiff, by counsel, respectfully requests that this Court allow Dr. Filler's testimony, and for such further relief as is necessary and proper.

Respectfully submitted,

Date: December 16, 2024        By:    _____/s/_____
                                       Mary T. Morgan, Esq.
                                       Virginia State Bar No. 44955
                                       *Counsel for Plaintiff*
                                       PARKER POLLARD WILTON & PEADEN
                                       4646 Princess Anne Road, Unit 104
                                       Virginia Beach, Virginia 23462
                                       Telephone: (757) 384-3166
                                       Facsimile: (866) 212-1310
                                       Email: mmorgan@parkerpollard.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of December 2024, I will electronically file the foregoing with the Clerk of Court using the CM/EMF system, which will send a notification of such filing (NEF) to all counsel of record, including:

John D. McGavin, Esq.
Emily Blake, Esq.
MCGAVIN, BOYCE, BARDOT,
THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
jmcgavin@mbbtklaw.com
*Counsel for Defendants*

_____/s/_____
Mary T. Morgan, Esq.
Virginia State Bar No:. 44955
Trevor B. Reid, Esq.
Virginia State Bar No:. 77233
*Counsel for Plaintiff*
PARKER POLLARD WILTON & PEADEN
4646 Princess Anne Road, Unit 104
Virginia Beach, Virginia 23462
Telephone: (757) 384-3166
Facsimile: (866) 212-1310
Email: mmorgan@parkerpollard.com
Email: treid@parkerpollard.com