```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Newport News Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5   JOANN WRIGHT HAYSBERT,             )
                                        )
 6          Plaintiff,                  )   CIVIL ACTION NO.
                                        )   4:24cv87
 7   v.                                 )
                                        )
 8   OUTBACK STEAKHOUSE OF FLORIDA,     )
     LLC,                               )
 9   and                                )
     BLOOMIN' BRANKS, INC.,             )
10                                      )
            Defendants.                 )
11   - - - - - - - - - - - - - - - - - -

12

13                    TRANSCRIPT OF PROCEEDINGS
                       (Final Pretrial Conference)
14
                          Norfolk, Virginia
15
                         January 16, 2025
16

17

18   BEFORE:  THE HONORABLE ELIZABETH W. HANES
              United States District Judge
19

20

21   APPEARANCES:

22            PARKER POLLARD WILTON & PEADEN
              By:  Mary Teresa Morgan
23                 Counsel for Plaintiff

24            McGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C.
              By:  John David McGavin
25                 Emily Blake
                   Counsel for Defendants
```

```
 1                  (Hearing commenced at 10:09 a.m.)
 2              THE COURT:  Good morning, everyone.
 3              MS. MORGAN:  Good morning, Your Honor.
 4              THE COURT:  Madam Clerk, can you call our next
 5     matter.
 6              THE CLERK:  Yes, Your Honor.
 7              Case number 4:24cv87, Joann Wright Haysbert versus
 8     Outback Steakhouse of Florida, LLC, and Bloomin' Brands,
 9     Inc.
10              The plaintiff is represented by Mary Morgan.
11              Ms. Morgan, are you ready to proceed?
12              MS. MORGAN:  I am ready, thank you.
13              Good morning.
14              THE CLERK:  The defendant is represented by John
15     McGavin and Emily Blake.
16              Mr. McGavin, are you ready to proceed?
17              MR. McGAVIN:  Yes, I am.
18              THE COURT:  All right.  Good morning to you all.
19     Good morning to everyone.  It's nice to see you all.
20              All right.  Let me just tell you how I'd like to
21     handle what order I think we'll go in generally, and then we
22     will get started.
23              I think we'll try to just have you stay seated, but
24     if we start to get into extensive argument, I'm going to
25     have you come up to the podium.  But as long as I can hear
```

```
 1    you and our court reporter is doing okay, then we'll have
 2    everyone remain seated.
 3            So, what I had hoped to do is, we have a number of
 4    motions in limine.  There is some additional motions filed.
 5    There is some issues raised in the Final Pretrial Order.
 6    And then I'll talk to you just a bit about my trial process
 7    at the end.
 8            Let me just walk through the motions in limine to
 9    make sure I understand which ones we're dealing with, and
10    which ones may have been resolved.
11            From plaintiff's side, there is a facts and brief
12    filed, but that's not really in my view a pending motion.
13    It's more informational, and so I don't believe that there
14    is any reason for me to address that.
15            Do you agree?
16            MS. MORGAN:  I do.
17            THE COURT:  Now, the treating physician motion in
18    limine I think may be resolved based upon which witnesses
19    you intend to call, but it wasn't entirely clear to me.
20            Is that still outstanding?
21            MS. MORGAN:  No.  I believe that's resolved because
22    the only three expert witnesses that I expect to call are
23    Filler, Haider, and Avrit.
24            THE COURT:  Very well.
25            And does the defense agree that then that motion in
```

1    *limine* is resolved?

2              MS. BLAKE:  Yes.

3              THE COURT:  All right.  So, I do think I'll need to

4    deal with the present sense impression motion *in limine*

5    issues relating to Dr. Filler, which are raised by both

6    parties and also relate to his PowerPoint demonstrative; the

7    admissibility of the two work orders; the brain map

8    demonstrative, which is raised by both parts.  There is a

9    request for judicial notice.

10             Defendants, in addition to those that were

11   duplicative of issues raised by plaintiff, makes a motion to

12   exclude corporate indifference, exclude internal policies,

13   and then they've made a separate motion relating to

14   supplementation, which I think we'll need to address.

15             Any other motions *in limine* that you think have

16   been resolved or are pending that I didn't just list,

17   Ms. Morgan?

18             MS. MORGAN:  I don't believe so, Your Honor.

19             THE COURT:  Okay.

20             Ms. Blake, are you going to handle this part?

21             MS. BLAKE:  Yes.

22             MR. McGAVIN:  Your Honor, may I say that we may

23   share and split up some of these motions depending upon

24   which one you take.

25             THE COURT:  Very well.  That's no problem.

```
 1              MR. McGAVIN:  We'll work together.
 2              MS. MORGAN:  And, Your Honor, I do think that there
 3    will be one or two issues that may resolve some of the
 4    global stuff, if you'd like me to address that after.  Thank
 5    you.
 6              THE COURT:  All right.
 7              MS. BLAKE:  I agree that --
 8              THE COURT REPORTER:  I'm sorry.  Is your mic even
 9    on?
10              MS. BLAKE:  It is not.
11              I agree that resolves all of the outstanding
12    issues.
13              THE COURT:  All right.
14              So, Ms. Morgan, do you want to address, you said
15    that there are one or two issues that may resolve?
16              MS. MORGAN:  Yes.  So, first of all, I think I've
17    made the decision, along with my partner, that we would like
18    to go ahead and dismiss Bloomin' Brands as a defendant.  The
19    condition, caveat that I would add to that is, I would like
20    to be able to either have the jury instructed by the Judge
21    or no preclusion of making reference to them during the
22    trial, because I think otherwise the jury will be confused
23    about their relationship, because some people do work for
24    Bloomin' Brands as the franchiser.  So, I don't know if just
25    explaining to the jury preliminarily that they are the
```

1    franchiser -- I have done a preliminary instruction on this

2    type of thing before -- but they're not a party to the

3    lawsuit.  So, that would just be my only request of the

4    Court.  I think that could deal with some of the issues that

5    we have pending today.

6              THE COURT:  All right.

7              MS. MORGAN:  The second one is that with respect to

8    Work Order 2, I have looked at this issue exhaustively, and

9    I do agree that it would constitute a subsequent remedial

10   measure under 403, I think -- 407, excuse me.  That

11   particular rule of evidence has exceptions.  I don't believe

12   any of them apply because I am not -- as you might imagine,

13   from my previous statement just a moment ago -- trying to

14   show ownership and control, but we will still argue over

15   Work Order Number 1, but I think that will eliminate some of

16   this as well.

17             THE COURT:  All right.  I want to make sure I

18   understood what you were saying.  I understand your point

19   about dismissing Bloomin' Brands and that there is some

20   effect on prior arguments you made relating to Work Order 2.

21   I'm just not clear, is Work Order 2 still at issue or?

22             MS. MORGAN:  I don't believe so, because we're not

23   going to seek to introduce it or make reference to it.

24             THE COURT:  Okay.

25             MS. MORGAN:  I'm sorry I wasn't clear.

```
 1              THE COURT:  So, that would take care of the
 2    admissibility relating to Work Order Number 2?
 3              MS. MORGAN:  Correct.
 4              THE COURT:  All right.  Anything else?
 5              MS. MORGAN:  I think that's it from our standpoint.
 6              THE COURT:  As to your first point relating to
 7    reference to Bloomin' Brands, I mean, I've seen this in
 8    other cases, whether it's a stipulation or something that I
 9    simply explain to the jury in my preliminary instructions
10    that say, you know, you may hear defendants referred to
11    as -- and you guys can talk about this language -- but
12    Bloomin' Brands or Outback Steakhouse, and so just simply
13    explain whatever it is that you need to explain so that they
14    can understand the testimony.
15              Mr. McGavin, I don't think you need to necessarily
16    decide, but I think it's helpful for you to hear that.  To
17    me, that seems like that would take care of any issues of
18    reference during the testimony and/or documentation so that
19    the jury can understand.
20              Do you anticipate other issues that I might not be
21    thinking about?
22              MR. McGAVIN:  Your Honor, what I would say is based
23    upon the last trial that we had, there were so many efforts
24    to inject both Bloomin' Brands and insurance into this case,
25    I don't know what the plaintiff has planned, and I am
```

1    extremely cautious that we do not start down that road.  I
2    know that plaintiff wants to persist on this issue of,
3    "Didn't somebody call Dr. Haysbert after this incident?"
4    And as we have argued, there is no duty on a corporation to
5    call afterwards.  So, that goes to this corporate
6    indifference issue.  So, I just -- I don't want to get
7    whipsawed and then get back into corporate indifference or
8    some of the other issues that were so prominent in the last
9    trial.
10           THE COURT:  All right.  So, let me, I think it
11   could help to go through and rule upon things.  You all can
12   talk afterwards.
13           Ms. Morgan, I appreciate that you're willing and
14   making attempts, and in my view dismissing one of the
15   defendants and withdrawing on the Work Order 2 suggests an
16   effort to streamline the case, and that is appreciated.
17   That is what everyone should be doing.
18           Mr. McGavin, look, I mean, we've all spent a lot of
19   time with this case in a way that I don't think anybody
20   would like to be spending this much time with this case, but
21   plaintiff now has new counsel, and my expectation is that
22   we've put those issues to bed, and we're going to get this
23   case tried.  And so, I understand that you are cautious, but
24   I think we still have to operate in a way in which we are
25   expecting that everyone is working in good faith to get this

1    case tried in a professional and efficient manner, and

2    that's, I think, the best way we can proceed at this point.

3            MR. McGAVIN:  I agree, Your Honor.

4            We have other issues as we work through today's

5    motions that we'll take up on their merits, but I believe

6    that it's not just Ms. Morgan involved in this case, based

7    upon the documents that we've received and that

8    they're -- I'm not sure what's going to happen at trial

9    regarding Mr. Haysbert, whether he'll be here sitting on the

10   front row directing traffic.  I want to be very clear that

11   when that starts to happen that we will be -- we will raise

12   that with the Court.

13           THE COURT:  All right.

14           Let's move on, then, to the first motion *in limine*

15   which is still pending, which relates to --

16           Ms. Morgan, how does she say her first name?

17           MS. MORGAN:  Nineveh, I believe.  Nineveh.

18           THE COURT:  Nineveh, okay.

19           -- Nineveh Haysbert's testimony regarding what

20   certain patrons had told her.

21           As I understand the motion, what she would testify

22   is set forth in her declaration, which has now been filed so

23   many times that I can't see the document number, but it's

24   been entered as her declaration.  And that's your

25   understanding as well, right?

1          MS. MORGAN:  That is correct, Your Honor.

2          THE COURT:  All right.  Do you have any arguments

3    you want to make?

4          MS. MORGAN:  I think it speaks for itself.  It was

5    filed, obviously, before I got involved in this case.  I

6    don't know that the declaration would necessarily even come

7    in.  I think that the testimony is sufficient, and I think

8    that when she testifies, it would be something to be raised

9    as objections for the trial court to consider at that time.

10         THE COURT:  All right.  I have reviewed this, and I

11   am going to deny your motion *in limine* for a couple of

12   reasons.

13         The issue that I see is that what the declaration

14   says, which we would anticipate her testimony to be, is that

15   a patron or patrons told her that an employee of the

16   restaurant was mopping the floor prior to her mother

17   slipping and falling in the area.  I think the problem with

18   that is, there is no indication -- prior to means before,

19   but it does not in any way provide any clarification as to

20   temporally, whether that was moments before or an hour

21   before, and that creates some problems.  Certainly, it

22   decreases the reliability and the relevance of the statement

23   itself.  But this exception to the hearsay statement

24   requires that the statement be made while you're perceiving

25   the event, which certainly does not occur here, or

```
1    immediately after.  And it's plaintiff's burden to show that
2    that kind of temporal component is met; that's so that it's
3    reliable.  And they can't, they can't meet that burden given
4    what the testimony is.  It is classic hearsay testimony, and
5    I don't find that the exception applies.
6         MS. MORGAN:  Your Honor, if we were able to elicit
7    some information that -- I think it's actually double
8    hearsay -- but if we were able to elicit some information
9    about when this occurred from Ms. Nineveh -- of course, I'm
10   sort of at a disadvantage because I did not try the original
11   case, and I'm in the process of going through everybody's
12   testimony and deposition testimony.  But that would be the
13   only exception I would ask, is that if we could put some
14   limits on the parameters of it, maybe just in a sidebar
15   without publishing it to the jury first; that's what I would
16   ask.
17        THE COURT:  I'm happy to revisit the ruling
18   depending on her testimony, but I think you have an uphill
19   battle, frankly.
20        MS. MORGAN:  I don't disagree.
21        THE COURT:  All right.  Let me deal, then, with the
22   first work order.  This is a work order dated March 7th of
23   2018, which is prior to the incident at issue in the case
24   and indicates:  "The floor up front needs replaced; floor
25   not refinished correctly; lots of slips and falls; when the
```

 1    temperature changes outside, it tends to collect moisture

 2    and sweat."

 3           Let me ask you, do the parties agree as to who

 4    authored this work order?

 5           MS. MORGAN:  I believe so.

 6           THE COURT:  That would be Mr. Wilson?

 7           MS. BLAKE:  Yes.

 8           THE COURT:  Okay.

 9           Now, Ms. Morgan, there has been some debate here as

10    to whether or not the work order is evidence of the

11    feasibility of precautionary measures.  I think, though,

12    that that may have been abandoned; is that correct?

13           MS. MORGAN:  Yeah.  I don't believe that that's my

14    theory.  The work order, in my view, constitutes potential

15    constructive notice to the defendant in this case.  As the

16    plaintiff, which is the side I'm not normally on, but as the

17    plaintiff, I have the burden of establishing notice.  I can

18    do that a number of different ways.

19           If you look at the *Memco Stores versus Yeatman*

20    case, which is 232 Virginia 50, that's a case that's

21    somewhat analogous to this.  This is the plant case where

22    the defendant furniture store I believe had a -- I'm trying

23    to think of the name of the plant -- pepromia plant that

24    they had placed on a table, and it was -- essentially, it

25    became a jury issue, and that's what the Supreme Court of

1    Virginia said, it was a jury issue as to whether the
2    defendants should have known or reasonably known that it was
3    foreseeable that this particular plant would lose its
4    leaves, that it could be on the floor for patrons to slip
5    on.
6            So, the analogy that I would draw, Your Honor, is
7    we've got a situation where a work order for the same type
8    of flooring -- it's not the exact same area, but the same
9    type of flooring -- is issued in March of 2018.  That puts
10   the defendants on notice that when the weather changes, you
11   know, that there is some condensation, people are slipping.
12   You combine that with Deajah Clark, who is an employee of
13   them, her testimony about witnessing people fall, and it
14   becomes a jury issue as to whether the defendant had notice
15   of this particular condition such that they should have
16   remedied it before Ms. Haysbert fell.
17           THE COURT:  So, before I get to the notice issue,
18   what I'm hearing from your argument is, you're not
19   attempting to use this record to show that the area of the
20   floor where Ms. Haysbert slipped and fell is the area of the
21   floor that was at issue; meaning, you're not seeking to use
22   the report to say this demonstrates that there was in fact a
23   defect, and it is that defect which caused her to fall?
24           MS. MORGAN:  No.  Because it's not that same area,
25   and I think that was raised a lot in the last trial, so, no,

1    but it is the same type of flooring.

2            THE COURT:  The floor itself, I mean, the way I

3    understand this, and I could be just misunderstanding, but

4    the same flooring was in the entire front of the house.  It

5    was not changed between this work order and the time in

6    which Ms. Haysbert fell.  Is that right?

7            MS. MORGAN:  That's my understanding, yes, Your

8    Honor.

9            THE COURT:  Okay.

10           MS. MORGAN:  We're dealing with essentially a

11   three-month period.

12           THE COURT:  All right.

13           MS. MORGAN:  It was obviously, as we know, changed

14   later, but for other reasons which we are not going to bring

15   up at trial.

16           THE COURT:  All right.  And so, just let me shift

17   to defense.  I think, let's just be clear about what this is

18   not about.  This is not a subsequent remedial measure.  It

19   happened before.  They're not seeking to bring in any

20   feasibility of precautionary measures.  She's identifying

21   that the issue is notice.

22           Your arguments had been that it's hearsay.  You

23   make an argument that it's not a business record, but I

24   believe that you previously agreed that it was an authentic

25   business record at the prior final pretrial conference, and

1    so that issue is -- well, I think it is a business record,

2    but I think you've also agreed that it is a business record.

3            And so, just let me, then, make sure I understand

4    what your argument is now.  What's your challenge?

5            MS. BLAKE:  So, for the hearsay issue, it's double

6    hearsay.  That was what I was trying to point out in this

7    most recent brief that I filed, was that even if you get

8    past the business record exception -- which we have

9    consented to that it is a business record -- Mr. Wilson's

10   statements within the business record are double hearsay.

11           And so, plaintiff's motion outlined that there was,

12   you know, sufficient deposition testimony to verify that

13   Mr. Wilson was employed by Outback at the time.  I think I

14   even only included this as a single paragraph at the end of

15   our most recent motion.  It was just to point out that at

16   that prior trial no foundation was ever laid at trial.  So,

17   there was no evidence.  So, it's inappropriate at this time

18   to move for the admissibility of this document based on

19   deposition testimony because we're not at trial.

20           But the real crux of the argument is the relevance

21   of what I am now understanding.

22           THE COURT:  Hold on just one second.  Let me just

23   talk about the double hearsay and make sure.

24           Their argument is that his statements are an

25   opposing party's statement.  He -- I mean, I think you've

 1    agreed -- put the work order in, and he had previously

 2    testified regarding that process, and that he was an

 3    employee at the time that the work order was made.

 4         Setting aside your argument that that evidence came

 5    in via deposition, are you contesting that if this evidence

 6    came in, in the way it came in at his deposition, that that

 7    statement is not an opposing party statement?

 8         MS. BLAKE:  I am not.

 9         THE COURT:  Okay.  So, then it's really a relevance

10    argument?

11         MS. BLAKE:  Yes.

12         THE COURT:  All right.  So, what's your relevance

13    argument, then?

14         MS. BLAKE:  So, and I might be a little bit

15    confused as to what has changed between the filing of

16    plaintiff's motion back on December 16 and what is being

17    represented today, but it sounds like plaintiff's counsel is

18    now saying that she understands that the work order does not

19    cover the area where plaintiff slipped and fell.

20         THE COURT:  That's my understanding of what she's

21    saying, it is not the same area.  So, it's a notice.

22         MS. BLAKE:  But notice as to what, right?  So,

23    notice, they have to prove that there was actual or

24    constructive notice of the particular defect that caused

25    plaintiff to fall.  It's not just notice that all of the

1  floors are defective all of the time.  That's not what the

2  work order says.  The work order says that there is a

3  particular issue in a particular part of our restaurant

4  during particular times as a result of particular weather

5  changes.  There has been substantial testimony about where

6  Dr. Haysbert fell, what caused her to fall.  Plaintiff

7  doesn't know.  Dr. Haysbert doesn't know what caused her to

8  fall.  The floor was slippery, according to her.

9        There is no evidence that anybody saw any

10  condensation on the floor at any time.  There is no evidence

11  that her clothes were soiled as a result.  There is no

12  wetness.

13        The only thing is that Ms. Haysbert, Nineveh

14  Haysbert, intends to testify that she saw somebody dry

15  mopping.  But just because somebody is dry mopping after the

16  slip and fall doesn't even mean that there was moisture on

17  the floor, or if there was moisture, that it was

18  condensation.  So, it's just kind of like when you walk

19  outside and you look at a puddle, you assume that it has

20  rained, but that's not the only explanation for the puddle.

21  Just because somebody was dry mopping on the floor does not

22  ipso facto mean that there was condensation on the floor

23  that was similar to the condensation described in this work

24  order.

25        THE COURT:  All right.  Just give me just one

1    moment.

2          So, let me deal with this in two steps.  The first

3    is a question about whether or not the record can come in as

4    a business record or whether it's hearsay.  Really, when

5    you're talking about kind of those types of evidentiary

6    questions, I think it is proper for me to consider

7    Mr. Wilson's deposition testimony regarding whether or not

8    the statements he makes in the exhibit are party statements,

9    and so that I think is appropriate to rule on currently and

10   doesn't need to wait until trial.

11         And so, on the hearsay objection, I'll overrule the

12   hearsay objection, finding that this document does satisfy

13   an exception to the hearsay rule as an authentic business

14   record containing opposing party's statements.

15         As to the relevancy objection, I am going to also

16   overrule that.  I do think there is some risk that the

17   argument could be made it is a confusion, it is this defect

18   which existed, or it's evidence of the defect, or alleging

19   that, you know, it is the same hazard essentially.

20   Ms. Morgan has been fairly clear that that's not her theory,

21   and so obviously the expectation is she's not going to delve

22   into testimony like that.  But it is evidence of notice.

23   The order does say "the floor up front," and it talks about

24   not just this condensation issue but also the refinishing of

25   the floors, and so I think it certainly is evidence of

1    notice.  It's probative of that fact, and I think that the

2    jury can understand that, and the risk of prejudice is not

3    so great that the document should be excluded on that basis.

4            Any questions about that?

5            MS. MORGAN:  No, Your Honor.

6            THE COURT:  The second work order has been dealt

7    with.

8            Defendants, I know I'm going a little bit out of

9    order here, but there has been some question about

10   witnesses.  I think that Ms. Morgan has clarified which

11   experts she intends at this moment to call.  Certainly, I

12   think that could change depending on we have some additional

13   rulings to deal with, but I think that issue has been

14   resolved.

15           Is that right, Mr. McGavin, or is there still some

16   question regarding witnesses generally that we need to

17   address?

18           MR. McGAVIN:  I think Ms. Blake is handling that

19   piece.

20           THE COURT:  All right.

21           MS. BLAKE:  I think that, yes, as long as we can

22   finalize which experts are intended to testify, that will

23   help us not expend so many costs as we did at the last trial

24   relating to our experts.

25           THE COURT:  All right.  So, at this point it's

1    clear it's Dr. Haider, Dr. Filler, and Mr. Avrit.  I know

2    we're going to talk about them in a moment, so we'll deal

3    with that.

4         All right.  So, let's then move to Dr. Filler.

5    Let's deal with these in two sets.  So, there is an initial

6    challenge that's been raised regarding his initial

7    disclosure.  I have reviewed and been provided his report,

8    and I have reviewed his testimony previously.

9         My review of the record is that Judge Krask

10   previously ruled relating to essentially whether or not he

11   was presenting scientific or specialized knowledge to assist

12   the trier of fact, and essentially overruled defendant's

13   objection on that point.  And I don't see that defendants

14   are contesting that he applied reasonable principles and

15   methods.  I think the issue is causation and lack of

16   foundation.

17        Ms. Blake, am I understanding that?

18        MR. McGAVIN:  This one is for me, Your Honor.

19        THE COURT:  All right.

20        MR. McGAVIN:  Thank you.

21        Yes, that's right.

22        THE COURT:  Okay.  Do you want to be heard?  Do you

23   want to be heard on that, in addition to anything you have

24   already briefed?

25        MR. McGAVIN:  Yes, Your Honor.

1          Dr. Filler came to trial with a PowerPoint and an

2    opinion where he had never seen the patient, hadn't read the

3    medical records, and was trying to offer evidence that she

4    had a brain injury.  And his opinion did not meet the

5    standard for reasonable degree of medical certainty based

6    upon an adequate foundation.  He was saying, "I have looked

7    at this film and this could be."  And that's not proper.

8    It's not proper foundation.  It's not a proper medical

9    opinion.

10         And I think the plaintiff concedes, evidently

11   concedes it was inadequate by the subsequent filing that we

12   received last week.  So, I think the best evidence of why

13   that opinion is faulty is that the plaintiff at the last

14   minute is trying to fix it and withheld the report from us

15   for over a year, after the Court allowed the plaintiff, over

16   our objection, to take a voluntary dismissal without

17   prejudice, having been ordered not to supplement, change or

18   otherwise modify the opinions, which we've complied with.

19   Two weeks later she went to see Dr. Filler, a report was

20   prepared and not provided to us.  In my opinion, that was

21   done by Mr. Haysbert -- because Ms. Morgan wasn't even

22   counsel of record -- which he shouldn't have done.

23         THE COURT:  I know we are going to get to this, but

24   I do want to deal with them in steps, because I think it's

25   helpful for me to deal with first the initial disclosure and

```
 1    then subsequently this supplementation issue.
 2           MR. McGAVIN:  But my point, Your Honor, is it's
 3    difficult to separate them because the second report
 4    demonstrates all of the problems with Dr. Filler's testimony
 5    and why we were so strenuously objecting to him.  Because
 6    Dr. Haider wasn't coming, there was no expert to talk about
 7    what her actual condition is.  She's never had
 8    neuropsychological testing.  So, to allow him to offer these
 9    opinions to talk about this sort of in a vacuum is highly
10    improper, and it's totally speculative.  So, based upon
11    that, he should not have been permitted to testify at all.
12    They even showed him -- I forget what they tried to show
13    him -- both the "Day in the Life" video, he shouldn't be
14    allowed to talk about that.  He never saw it.  And there was
15    another document -- I can't remember right now what it
16    was -- where he was shown and asked to testify about it, and
17    he said, "I don't even know what that is."  That's further
18    evidence of the problems with his testimony.
19           THE COURT:  All right.
20           Ms. Morgan.
21           MS. MORGAN:  Do you mind if I stand?
22           THE COURT:  Go ahead.
23           MS. MORGAN:  It's just a little easier.
24           Your Honor, thank you.
25           As a preliminary matter, I'd like to raise the
```

1    point that even though we did file the admissibility

2    request, this issue was dealt with at the trial by Judge

3    Smith.  There were 70-something pages of her, even before

4    the jury was brought in.

5         And Dr. Filler did testify in that case.  Judge

6    Smith allowed him to testify after pressing him on certain

7    points and being cross-examined by Mr. McGavin, and he still

8    did testify.

9         What we have here is another example of the defense

10   taking that and using it essentially as if they had deposed

11   him, which they chose not to do before the trial in the last

12   case, and now trying to exclude his opinions after he's

13   already testified at trial.  So, I just want to make that

14   point on the record.

15        Now, when Dr. Filler came in -- we put a lot of

16   things in our brief -- but he is the inventor of Diffusion

17   Tensor Imaging, the DTI process.  He doesn't do it himself

18   because it's a procedure that you stick things on their

19   brain.  But he invented that process.  So, there are places

20   around the country where a person goes, and they run the

21   brain scans.

22        He ran -- he requested -- well, I think Dr. Haider

23   in connection with him requested the brain scans using that

24   technology, and then he reviewed it.

25        And when he was at trial, he explained, "I look at

1    the brain scans.  Yes, I typically do see a patient" --
2    which I'll -- we'll get to that in a little bit -- "but in
3    this case I did not.  What I did do was, I looked at the
4    clinical findings of Dr. Haider."  She wasn't there at
5    trial.  She wasn't going to be there.  But that's not
6    necessarily an issue because Rule 407 allows an expert to
7    rely on other things, whether they personally observed it or
8    just read it or not.  So, I think that was a trial objection
9    that was raised, and maybe was an issue for Judge Smith,
10   maybe it wasn't.  But it's not like he did nothing in that
11   trial.
12          His opinions are laid out in his report.  The
13   findings are at Page 2, 6, 25, and 26.  His impressions are
14   at 3, 7, and 26.  He puts the brain scans, which he
15   reviewed -- and the way he explained it at trial is like
16   it's like somebody looking at a picture of a broken arm and
17   seeing the break in the arm.  It's not just a radiologist
18   reading it.  He's looking at a scan from the technology that
19   he developed.  And then he explained to Judge Smith, "Well,
20   this is why it was written in the way that it was."  He's
21   actually also a lawyer.  I caught that when I read his trial
22   transcript.  But he said, "I can formulate it in a way where
23   I'm reciting it to a reasonable degree of medical certainty"
24   -- which he confirmed that he did at trial -- "but I wrote
25   this as a clinician."  Yes, not one that had seen her.  But

1    he alluded to the fact that he probably would see her.  And

2    I know we're going to get to this argument about why he did.

3    But it was contemplated from the very beginning of his

4    retention that he would eventually see her, he just hadn't

5    at that point in time.  But he said, "I can talk about the

6    scans."  There was a big dialogue with him and Judge Smith.

7    And he said, "I read her scans."

8            "Well, you didn't see her brain."

9            Well, nobody can see anybody's brain.  It's inside

10   their head.  The best evidence of a brain is not just

11   sitting and looking at somebody, it's reviewing their brain

12   scans, which he did.

13           So, I think everything that he did was questioned

14   and within the field that he should be in at this point, and

15   he was properly allowed in the last trial, and he should be

16   properly allowed at this trial.  And I'll get to the other

17   stuff later, Your Honor, but that's essentially what we have

18   to say on that.

19           Thank you.

20           THE COURT:  All right.  So, let me just deal first

21   with this, his initial disclosure, and clearly what I'm

22   considering.  I mean, I would not say that it's necessarily

23   a *Daubert* motion that's been raised, but there is a question

24   regarding, really, the admissibility of his opinions.

25           And to me, having reviewed both his report but also

1    then his testimony, I agree with Ms. Morgan that this review

2    of these images, there has not really been a challenge to

3    whether or not that's a reliable process, and that's not

4    really at issue.  I think given his profession and his

5    testimony, his review of those scans is appropriate.

6            What his report indicates is that he reviews the

7    scans, and he, based upon his review of the scans, makes

8    certain findings, so, you know, the scans themselves.  The

9    first one reveals losses bilaterally in the frontal lobe,

10   and so that's a finding I think is perfectly appropriate for

11   him to make given his review of the scans themselves.  I

12   think there is no reason that he would need to evaluate

13   Dr. Haysbert in order to make those findings.  And I think

14   there is sufficient foundation.  He received the scans and

15   he reviewed them.  I think his report makes clear that he

16   reviewed those images.  I don't think there is any issue

17   with that.  And I think, again, it's consistent with this is

18   the type of information he would review as well as the

19   information from Dr. Haider in making his opinion, and so I

20   think those opinions appropriately should come in or could

21   come in.

22           Regarding his causation, you know, I think that to

23   the extent that there was some confusion regarding the

24   language he uses in his opinions, he does clarify that in

25   his testimony that he provided.  And I think he does make a

1    causation opinion, and he makes that to a reasonable degree

2    of medical certainty, and he testifies to that.  To the

3    extent that there is some confusion with the language that

4    he uses in the report, I think that's understandable and

5    explainable, and I don't think it rises to the level that

6    would justify exclusion on that basis.

7          Now, I do want to be careful about what his

8    causation opinion is, because he clearly at this point had

9    not spoken to Dr. Haysbert.

10          Ms. Morgan, you mentioned the review of

11    Dr. Haider's clinical findings.

12          I just want to be clear, because I don't want to

13    make a ruling and then for there to be some disagreement

14    regarding how far his opinion goes regarding causation, and

15    so certainly, in my mind it would be appropriate.  He's

16    identified certain things within the imaging.  And if you

17    were to ask him, you know, just using this as an example, is

18    loss of sight consistent with that injury?  Because

19    that's one of the -- I know she hasn't said this, but let's

20    just say she testified, "I lost my sight."  And so, then you

21    ask him, is loss of sight consistent with what you're seeing

22    on the scan?  And he says, yes.  That's one opinion.  Kind

23    of to me a more significant opinion would be, What I'm

24    seeing here was caused by this specific event.

25          And so my question is, explain to me what you

1    understand his causation opinion to be.

2         MS. MORGAN:  I mean, I think that he has concluded

3    and opined that she sustained a traumatic event, and by

4    history, because he does say that he relied upon the

5    clinical information from Dr. Haider -- that's in the trial

6    transcript at 411.  And that trauma he can recognize on the

7    images, and it's consistent with a trauma to the brain.  It

8    has nothing to do with, you know, why she fell or anything

9    along those lines, but a fall.  And I think the way he

10   explained it was, in her line of work, where she's primarily

11   administrative, you know, she's not going to be on a jobsite

12   banging her head around, but she did by history sustain a

13   fall, and that fall is consistent with what he's seeing in

14   the shearing and other images on her brain scans.  And so,

15   there is a causal relationship between the fall and the

16   resulting images and the resulting problems.

17        Now, I mean, he could be cross-examined on a

18   multitude of other points.  You know, she could have been in

19   a car accident.  She could have done this and this.  And

20   that's why we take depositions, and that's why we

21   cross-examine.

22        THE COURT:  All right.

23        MS. MORGAN:  Is that sufficient to answer your

24   question?

25        THE COURT:  It is.

1          Mr. McGavin, do you want to be heard?

2          MR. McGAVIN:  That's not the standard.  It's

3    not it's consistent with.  That doesn't meet the standard

4    for medical testimony.  It has to be to a reasonable degree

5    of medical certainty this was caused by this event.  It's

6    basically serving up a laundry list of potential causes, but

7    he doesn't have the foundation to link any clinical

8    correlation of any claimed symptom to this occurrence.  It's

9    just it's out in the atmosphere without a connection.

10          And he is neither designated nor qualified nor

11   prepared to testify to those things because he read no

12   medical records.  He never talked to the patient.  All he

13   did is receive a scan and write a report that he writes in

14   every case.  And he looked at some images and says, yeah,

15   this can be consistent with trauma.  But he doesn't know the

16   severity of the trauma.  He doesn't know if there was loss

17   of consciousness.  He doesn't know if there was physical

18   injury or physical indication of injury.  He doesn't know if

19   there was an emergency room visit.  He doesn't know that she

20   left and got in a car and drove to South Carolina, and that

21   she didn't seek any care until several days later.  He

22   doesn't know that every time she went to her primary care

23   physician she offered no complaints of cognitive deficits.

24   He doesn't know any of that history.  So, for him just to

25   say "it's consistent with" does not meet the standard, and

1    therefore it should be excluded.

2           He's limited.  If the Court permits him to testify,

3    he is limited.  And if there is no Dr. Haider or somebody

4    else to link all of this, it's irrelevant, and it doesn't

5    assist the jury in reaching a conclusion.

6           THE COURT:  Ms. Morgan, you had indicated that at

7    trial -- and this is my recollection -- that he testified he

8    had reviewed the clinical findings of Dr. Haider with the

9    scans; is that right?

10           MS. MORGAN:  That's correct.

11           THE COURT:  What are those documents?

12           MS. MORGAN:  They are located in Dr. Haider's

13    report, and I actually just pulled that up.  There is a

14    neurological evaluation that's 27 pages long, and then there

15    is a life care plan that follows that.  So, that does talk

16    about what happened to her in the incident.  I think that's

17    all cross-examination area.  I mean, he relied on what he

18    relied on.

19           And maybe I didn't state it right now in the best

20    terminology, but you were asking me specifically about what

21    he said in term of causation, but he did say that his

22    opinions were drawn to a reasonable degree of medical

23    certainty.

24           THE COURT:  All right.  Give me just one moment.

25           All right.  I am going to overrule the defendant's

1  objection.  In reviewing his report -- and I think it has to

2  be taken together with his testimony -- he does articulate

3  that his opinions are made to a reasonable degree of medical

4  certainty.  And so, I think the use of this "consistent

5  with," which is often how it's -- that is a term that's

6  used, for example, in DNA evidence even.  It only goes so

7  far.  There are limitations to his expert opinion, and those

8  are the points that can be made on cross-examination, but I

9  don't think it makes -- it doesn't undermine his opinion in

10 the way that Mr. McGavin is suggesting.  And I think when

11 you look together at the testimony as well as his report, he

12 was reviewing in those, and there is at least some reference

13 to this information from Dr. Haider, and so I think it may

14 not have been entirely clear that he had received that, but

15 together with his testimony that he had and the language in

16 the report itself, that's the information that he had.  I

17 think that is the type of information someone in his field

18 would generally look to, and the opinions that he draws, I

19 think, are sufficiently reliable to be admitted at trial.

20 So, on that basis that objection is overruled.

21         Let's now deal with the supplemental expert

22 designation.

23         My understanding, Ms. Morgan, is that that

24 supplemental opinion is based upon a January 2024

25 evaluation, meaning an evaluation done one year ago, that it

1  included an evaluation of her via Zoom, of the plaintiff,

2  but also during that evaluation there were some

3  questionnaires and things completed with her.  And my

4  understanding is that neither the report nor that additional

5  information has been disclosed to the defense, and that the

6  supplement was made on January 10th, 2025, which was six

7  days ago.

8          MS. MORGAN:  That is correct, Your Honor.

9          I did make reference to Ms. Blake in December, when

10  we were discussing these motions, that it was my

11  understanding that she had been seen, but I had not been

12  able to put my hands on any documentation at that point.

13  So, I gave what I had to the defense within I think five

14  business days of when I got it.

15          THE COURT:  All right.

16          MS. MORGAN:  And I'll explain a little bit more

17  about that.

18          THE COURT:  Go ahead.

19          MS. MORGAN:  Do you want me to?

20          THE COURT:  Sure.

21          MS. MORGAN:  Okay.  I understand the defense

22  argument to some degree.  I am almost always exclusively on

23  the defense side, but this situation is not how they've

24  couched it to be.

25          So, as you know, Mr. Haysbert was counsel for

1    Dr. Haysbert up until when Judge Smith's opinion revoked his
2    *pro hac vice*.  And I think you've questioned him before when
3    he was helping her file documents and whatnot, and we have
4    affirmatively stated that that was the case.  That does not
5    mean that he was not assisting her, and he is not precluded
6    from doing so, just like he is not precluded from assisting
7    me in this case because he is former trial counsel, and he
8    is a licensed attorney.  He is not doing any filing.  He is
9    not doing anything in Virginia.  He is not conducting
10   depositions.  But he is former trial counsel, and he is a
11   relative of the plaintiff.

12        And so, he is, contrary to Mr. McGavin's assertion,
13   entitled to be somewhat involved in this case, and he does
14   plan to be here.  He's not going to sit at counsel table
15   with me.  But this is his mother that is coming to trial, so
16   we can take that up at a later time.

17        But here's -- I'm going to talk a little bit about
18   the conditions that were imposed, and what I felt my
19   obligations were, and then how the supplemental reports came
20   to be.

21        Now, of course, the voluntary dismissal, the
22   hearing on that, the motion to clarify, which I was involved
23   in the order on the motion to clarify, all came down between
24   December and April of 2024, well, December of 2023, April of
25   2024.  There were certain conditions that were laid out by

1    the Court including, you know, no refiling in the Eastern

2    District, no additional discovery, pretrial determinations

3    procedurally the same, and then the one expert's withdrawn

4    was the Court revoked that.

5         I do not see providing supplemental reports as

6    engaging in additional discovery.  I am not asking

7    questions.  I am simply turning over material that I have.

8         Now, I personally had no involvement in plaintiff's

9    decision to go see Dr. Filler, but that, as I mentioned a

10   moment ago, was in January of 2024, long before I was

11   involved, at least in this part of the case as a primary

12   player, and it was contemplated from the beginning of his

13   representation.

14        I will say this, too, Your Honor.  When you have a

15   mistrial, it presents a very unique set of circumstances.

16   You can say we're going to freeze everything, and it all be

17   the same, but the reality is that it doesn't, it doesn't

18   really work like that because lives go on, and people need

19   care, and they need treatment.

20        So, what my understanding is, is that she at trial

21   -- what happened was he met with her, and because she did

22   need treatment -- he actually was there, as I mentioned just

23   a few moments ago, in more of a clinical role, and it was

24   his intention to see her.  So, he did see her on January 3rd

25   of 2024.

1          Now, let's talk about my duty to supplement.  Rule
2     26 is very specific.  There is a must supplement when I get
3     it, okay?  That is an ongoing obligation, not just in state
4     court but in federal court.
5          So, let's just pretend for a moment that between
6     August of 2023 and January of 2024 or even January of 2025
7     something else had happened.  Let's say that there had been
8     a change in the medical field such that it changed his
9     opinions, or he invented something else.  Or from Brad
10    Avrit's standpoint, let's say that there had been a change
11    in engineering principles that caused something to change.
12    Or maybe there was a change in the law.  All of those
13    situations would have required me to disclose.
14         Just like if there is a motion to continue because
15    the Judge has COVID or a party has COVID, and the plaintiff
16    continues treating, those conditions are -- they're required
17    to be told to the defense, and that's why I told them.
18         Imagine for a moment if I had put Dr. Filler on the
19    stand without supplementing, and on cross-examination
20    Mr. McGavin asks him, "Well, Dr. Filler, you never saw the
21    plaintiff."  And he says, "Well, actually I did."  Don't you
22    think that they would be a little upset if I hadn't told
23    them about that situation and supplemented?  Absolutely.  I
24    would be as a defense attorney.  So, I felt that it was my
25    obligation to do that, and I did it as soon as I could.

1          Now, in terms of the timing, I haven't been
2     involved in this case for very long.  I have the
3     disadvantage of coming in and not even being a plaintiff's
4     attorney.  But as I mentioned, it was always intended for
5     plaintiff to be treated by him, and in fact there were
6     several times during his testimony where he referenced, you
7     know, "I'm a clinician.  I see my patients.  I plan to see
8     my patients."  He has extensive experience and specialized
9     knowledge in that area, and he met with her at the time of
10    trial, and they decided, it's my understanding, at that time
11    to have her follow-up care.

12         And if you have read his supplemental report, he
13    has in fact seen her.  He has put her on medication.  He is
14    essentially now a treating physician, although he's already
15    -- you know, I wasn't going to change his status and call
16    him that, but that's essentially what he is, and I think
17    he's even made a conclusion that some of her effects are
18    reversible.  And for Dr. Haysbert this is not just about
19    this case, this is about her health, and so that's why she's
20    seeing Dr. Filler.

21         Now, Avrit, I'll just touch on this briefly because
22    I know that's an issue as well.  And actually, this is
23    entirely my fault, Your Honor.  I was very curious as to
24    whether Mr. Avrit had supplemented his report, because when
25    I went through it, I said, you know, in his initial report

1  he referred to some climatological changes and conditions,

2  and that was on Page 2 and 4 of his initial report.

3          And so, I talked to Nazareth and I said, hey, when

4  you were trying to get trial counsel involved -- those 15

5  attorneys or more that he tried to relate or tried to get

6  involved in the case before I got in -- "did you have them

7  look at anything?  And he said, yes.  I sent them his

8  report, and a lot of the feedback I got was, beef up this

9  report, because he does talk about it, but yet he doesn't

10 clarify it.

11         So, what I had printed and given to counsel was

12 dated January 10th, 2025.  That is not the date that Brad

13 Avrit prepared his report.  It is actually dated

14 February 8th, 2024, so almost a year ago.

15         Now, what happened, and the reason that I say it's

16 my fault, I didn't catch this at the time -- and there is

17 the February time -- when Nazareth sent this to me, because

18 it was in his files, I looked at it, and I saw it, and I saw

19 it hadn't been signed.  So, this copy that's dated

20 February 8th, when it was penned, was not signed.  And I

21 contacted Brad Avrit's office and I said, hey, you need to

22 sign your report.  That's a requirement under the federal

23 rules.  So he did.  And when he signed it, it redated it for

24 January 10th of 2025.  So, this report was actually prepared

25 a year ago.  And when I got it, I turned it over again for

1  the same reasons that I turned over the Filler report, which
2  was because I felt like I had an obligation to do so.  And
3  it's not entirely new matter.  There is -- I went through
4  and, yes, there is some additional data but, again, it was
5  considered back in 2024, and it's merely clarification of
6  what he initially talked about, which is what he was
7  recommended to do when other attorneys, other than myself,
8  looked at the file in this case in contemplating whether
9  they would take the case or not.
10         Thank you.
11         And I'll pass up that February copy.
12         THE COURT:  Thank you.
13         MS. MORGAN:  And you can see it's the date and it's
14  not signed.
15         THE COURT:  I am going to try to take these a
16  little bit separately.
17         Setting aside I think this issue with Mr. Haysbert,
18  there is some allegations made regarding his involvement,
19  I'm just going to put a pin in those for right now.
20         Let me just deal with the supplemental.  I think
21  Ms. Morgan is likely right about her duty to supplement.
22  The issue here is that we are at the final pretrial
23  conference.  These documents, the supplements themselves,
24  were drafted a year ago.  And they are, in my view,
25  especially more Mr. Avrit's than Dr. Filler's, not really

1    supplements to begin with, but shoring up of opinions in a

2    way that's very beneficial to plaintiff and detrimental to

3    defense, and the problem is, is that it just would be

4    fundamentally unfair to the defendants to have to suddenly

5    deal with these new opinions, the facts upon which they're

6    based, without an opportunity to have a new opportunity to

7    depose these witnesses, to investigate the claims that they

8    have made, to look behind the opinions themselves.

9         And so, I can recognize I think that, Ms. Morgan,

10   you may have been in a bit of a tight spot regarding what to

11   do with them.  I think, like I said, you likely probably did

12   have to supplement, but that's a separate issue from whether

13   or not those opinions reflected in the supplemental reports

14   should come into evidence at trial.

15        And based upon the failure to timely supplement and

16   the nature of the supplementation, I don't find that they're

17   appropriate, and it is not evidence that should come in at

18   trial.  And I think that that's just fairly clear.

19        Now, I think you're right in that supplementation

20   when there is changing, for example, medical circumstances

21   could be necessary or appropriate.  But the other side has

22   to have sufficient time and information to respond to those,

23   and they don't have that here.  And so, I think it's very

24   clear from a timing standpoint and fairness that those new

25   opinions and their opinions based on review of any new

1   information is excluded from the trial.

2       I know you have made other kind of -- you've asked

3   for some other additional relief, but let me just first

4   understand, is that clear?  Do you think that raises -- are

5   there questions that either party has regarding

6   implementation of that at trial?

7       Defense?

8       MR. McGAVIN:  I do, Your Honor.

9       THE COURT:  Go ahead.

10      MR. McGAVIN:  I followed the court order.  I have

11  not gone to my experts and asked them to do supplemental

12  work, develop supplemental opinions, read supplemental

13  records.  I have done none of that.

14      The Court's order was very clear.  Your order, over

15  my objection, allowed a dismissal without prejudice and said

16  no new experts are coming, no supplementation, and that

17  order couldn't have been clearer.  I complied with it

18  100 percent.

19      Then Your Honor granted the motion to reconsider to

20  allow potentially all of the experts to come in, which

21  plaintiff's team knew, and they failed to comply with it.

22  And there should be a penalty because I would like to have

23  my experts doing supplemental reading, supplemental

24  research, supplemental literature to improve their opinions.

25  But now I'm in the position with both of these experts that

1    they're irreparably tainted.

2         Filler is definitely going to take the stand, and

3    when I say to him and say, you've never seen this lady and

4    treated her, what are we going to do?  How can he possibly

5    testify at that point?  He's going to say, well, at the time

6    that I wrote my report I hadn't seen her, but I have,

7    Mr. McGavin.  I mean, how are we going to possibly deal with

8    this?

9         And it's a deliberate -- this is what's so

10   frustrating in this case -- this is a deliberate ignorance

11   and a deliberate effort to go around Your Honor's orders.

12   And if Mr. Haysbert is actively assisting in this case and

13   working with Ms. Morgan, then he knows about the order.  I

14   would like to see the emails to these guys.  They should

15   have produced the emails so I could know what the

16   communication was and whether they were notified.

17        The Court has said you really can't do anything

18   further; the case is where it was when it was tried back in

19   August of 2023.  And we've abided by that.

20        And to get this a week before trial with no

21   explanation other than, I didn't have it available to me.

22   That's code for Mr. Haysbert had it.  He's working behind

23   the scenes.  And now Ms. Morgan is saying, I'm just reading

24   through the transcripts to learn about this.

25        This is not fair.  And it's more than fundamentally

1    unfair to say these reports can't be used.  How are we going
2    to have Dr. Filler on the stand and have him
3    compartmentalize in his own brain what was in his opinion
4    that he offered in August of 2023, compared to now he's a
5    treating physician, prescribing medication?
6          I'm going to have to ask -- I want to ask
7    Dr. Haysbert, have you had any medication for these
8    treatments?  Today is the first I've heard of that.  If
9    she's had any medical care, seen a healthcare provider, seen
10   a family physician, physical therapy, cognitive therapy, I
11   have none of that.  And I am absolutely hamstrung now based
12   upon what else they may have done.
13         And so, to allow Dr. Filler to testify, I
14   strenuously object.  He's tainted.  They violated the court
15   order.  They didn't timely supplement.  And to say, I didn't
16   have it available, and it's a year later -- if I did that on
17   my side, there would be a penalty.  In the Federal Court,
18   U.S. District Court in the Eastern District, there would be
19   a penalty.  I would get penalized.  And it's more than you
20   just can't have the supplement.  Dr. Filler is irreparably
21   tainted.
22         Alternatively, Your Honor, I want a continuance.  I
23   want a continuance so I can take his deposition.  I want to
24   know the sequence of how this occurred.  I want to know who
25   was involved.  I want his emails about how this took place.

1    I want to know what treatment has been done.

2          This is absolutely outrageous, and it's not -- you

3    can't just stand up in front of the Court and say, you know,

4    I just didn't have it available, but I'm going to supplement

5    it, and, you know, we'll just kind of separate it all out.

6          There was a specific court order.  It was a

7    draconian measure to grant a mistrial.  The Court then gave

8    the plaintiff a break to allow her to dismiss without

9    prejudice, then relented to allow all of the experts to

10   come.  And rather than put Mr. Haysbert up here to explain

11   what he was doing, Ms. Morgan is offering, you know, her

12   involvement and don't penalize me.

13         But this is irreparably unfair, and I should not

14   have to now confront and cross-examine Mr. Filler or

15   Dr. Filler about how he's going to separate all of this out.

16         I feel that I am extremely prejudiced, and I want

17   to be able to go to my experts and have them supplement

18   their reports and do additional preparation.  And then I'll

19   just say to them, look, all of the extra stuff you've

20   learned, keep that separate in your own brain, and that will

21   be good enough to comply with the court order.

22         As to Mr. Avrit, we have more foundational

23   objections to his opinions because they're irrelevant.

24   There is no evidence it was raining that day.  That's his

25   preliminary opinion.  So, we still have that out there to be

1    resolved.

2          But fundamentally, Your Honor, we feel that this

3    has tainted this case, that to take the key witness -- and I

4    don't know what Dr. Haider has been doing.  Is there any

5    supplement about her?  Has she been communicating with

6    Dr. Filler?  I don't know.

7          And I don't know what Mr. Haysbert has been up to.

8    Obviously, Ms. Morgan doesn't.

9          So, I'm very, very, concerned, Your Honor, and feel

10   that we are being severely prejudiced.

11         THE COURT:  So, Mr. McGavin, I want to talk through

12   this just a bit because -- and the reason I'm trying to

13   compartmentalize a bit is because I'm going to deal with at

14   the end any issues regarding Mr. Haysbert, and so I hear

15   your concerns about that.  I recognize you're saying, well,

16   look, there is some overlap.  But I'm also trying to move us

17   along.  So, let's just put that in a box for later.

18         Then there is this issue about Dr. Filler.  Now, it

19   is, of course, an issue a bit, and it would have been and

20   will be regardless, in that Dr. Haysbert has continued to

21   live her life.  If she, for example -- you know, I think

22   she's still working.

23         MR. McGAVIN:  She retired.

24         THE COURT:  Okay.  She's retired.

25         But the point is, is we can handle it in a couple

1   of different ways, and this would happen in a normal trial,

2   where you depose a plaintiff, and it may be that they get a

3   job after you deposed them that might be relevant to

4   whatever you want to cross-examine them on.  So, you're

5   either drawing a line and saying, we're going to completely

6   ignore anything that happened, and she herself couldn't

7   testify about her current abilities right now, right?  But

8   that does create some issues because you'd have to be very

9   careful in your questioning about her, to her, about her

10  abilities, or if she's still working.  And so whereas at the

11  first trial you would have asked, "You're still working,

12  right?"  "Yes, I'm still working."  Well, if you ask that at

13  our trial, she's going to say, "No, I retired."  Right?  And

14  so, something has changed.  Something has changed, okay?

15  We'd have to figure out how to deal with that regardless.

16          MR. McGAVIN:  Yes.

17          THE COURT:  I think that consistent with how a

18  normal trial would work, that typically a plaintiff would be

19  permitted to testify to things that had changed after their

20  deposition; or if a trial gets moved, if something happened

21  in that interim period, they could testify about that, and

22  you could cross-examine on that.

23          Related to that is then this issue of whether

24  Dr. Filler is tainted.  The reason I bring the first issue

25  up is because your argument, to me, it kind of misses the

1    point a bit in that when she testifies, she's not going to

2    draw a line in the sand about her abilities and things like

3    that.  Is that what you would expect if Dr. Haysbert

4    testified, what to expect on cross-examination?  What would

5    you expect her to testify about?

6              MR. McGAVIN:  Let me answer that question this way.

7    Yes, I would expect her to testify to her current status,

8    but I would expect that I would be allowed to take her

9    deposition, a supplemental deposition.  But --

10             THE COURT:  You didn't ask for that even before

11   this.  I mean --

12             MR. McGAVIN:  Well, let me just finish this

13   thought, Your Honor.  Because the Court granted this new

14   trial and allowed the plaintiff to come back, then I would

15   expect that if there is going to be anything supplemental or

16   changed, that we would have to come back to the Court and

17   get that.  So, we've stood by and not done anything

18   additional, but typically if --

19             So, you're saying it's on me, I should have asked

20   for a supplemental deposition and required the plaintiff to

21   supplement?

22             THE COURT:  No.  I'm trying to understand because

23   what you're saying to me seems inconsistent.  You're saying,

24   I would expect the plaintiff to testify to her current

25   abilities, current status.  "Are you taking medication?"

JILL H. TRAIL, Official Court Reporter

1    "Yes, I'm taking medication now.  I'm taking" -- you know,

2    if she's taking something -- "this is what I'm taking."

3         So, I think what I understood you to say was that

4    you would expect and find it to be appropriate that

5    plaintiff in providing her testimony would testify to things

6    like that.  And I'm not trying to trap you.  I'm literally

7    -- I think this is a complicating thing to try to figure out

8    given the timing problems.  And so, I think that's what

9    you're saying, but I just want to confirm that that's what

10   you're saying.

11        MR. McGAVIN:  I would, Your Honor, but not in the

12   confines of this case, the way this developed.  We went to

13   trial in August of 2023.  The plaintiff then refiles, and

14   we're under this order.  I never expected to be getting

15   supplemental reports and an argument that she's now under

16   treatment.  So, that's why I say that, based upon these

17   revelations, I want to take her deposition again.  I want to

18   have my experts review all of this material so I'm

19   adequately prepared.  Because the Court in crafting this

20   standstill order, which I complied with 100 percent, it now

21   has left me, as I'm realizing what the plaintiff has been

22   doing, developing new experts, new reports, seeing new

23   doctors and continuing to treat -- and if they were going to

24   supplement from January of 2024, timely, then I would have

25   come in and said, okay, now I want to take his deposition.

1    I want to get my experts to review this.  Because what's
2    happened is by sandbagging me on this case, I'm sitting here
3    expecting the rules are the same, and they're operating
4    under different rules.
5         THE COURT:  So, I think, then, your point is
6    because she's sought additional treatment from these
7    doctors, which is kind of a separate issue, but that the
8    additional treatment should have been disclosed?  I mean,
9    certainly would have been disclosed had the supplemental
10   reports been disclosed timely.  But you're put in a place
11   where if she's received additional treatment, you would
12   generally have anticipated that she was going to testify,
13   you know, she's not working anymore, I've had these issues.
14   But that treatment is such that it's more significant and it
15   alters the playing field.
16        MR. McGAVIN:  It's changed.
17        Excuse me.  May I consult with Ms. Blake?
18        THE COURT:  Go ahead.
19        MR. McGAVIN:  She wants to ask me or make a point
20   that I'm probably forgetting.
21        May I step aside for one second?
22        THE COURT:  You may.  Go ahead.
23        MR. McGAVIN:  Excuse me one second, Your Honor.
24        I think the point Ms. Blake -- I think the point is
25   that I'm getting wound up, perhaps, and I apologize for

JILL H. TRAIL, Official Court Reporter

1    that, Your Honor, but I do feel -- nobody cares what I feel.

2    I think I have demonstrated that, Your Honor.

3         The point is, they do have a duty to supplement,

4    and it's to timely supplement, whether it's Dr. Haysbert

5    retired and is now on medication.  Even with the Court's

6    order, that duty to supplement remains, and that would be on

7    the plaintiff.

8         And it's not adequate just to say, I didn't have it

9    available to me.  You had the plaintiff as your client.  And

10   we'll talk about Mr. Haysbert at the end.  I know you want

11   to compartmentalize that, but you can't take him out of this

12   case because his fingerprints are all over this, and that's

13   what's so frustrating having sat -- okay.  I'm sorry.  I

14   know you don't want me to go there.  I apologize.

15        THE COURT:  Well, Mr. McGavin, I am a bit surprised

16   that you would ask for a continuance, in part because I

17   think I've been clear to say I've excluded any

18   information provided to Dr. Filler or any opinions that

19   could be interpreted as flowing from this new information

20   provided to him.

21        I will tell you just generally, that having seen a

22   lot of experts testify, that I think compartmentalizing

23   Dr. Filler and cabining his testimony is not the same hurdle

24   that you describe it as, in my mind.  For example, I think

25   you could say to him, you know, your opinions were made as

1  of this date.  As of that date you had not reviewed her.

2  You had not... you know.  And then it would be, I think it

3  would be simple to avoid that issue.  That does not address

4  or remedy this other problem of the additional treatment,

5  and I am considering your request.  But I mean, frankly, my

6  concern is you're really, then, just asking to open this can

7  of worms which is, you know, and costs, depositions, new

8  experts, this whole new round of, well, this is a new

9  opinion, and this is not supplementation, and I mean just a

10 mess of things.  And frankly, I mean, I guess I'm then just

11 surprised that you think that that relief is a better relief

12 for you than the relief that I've given you, and --

13        MR. McGAVIN:  But I'm not done on the relief I'm

14 seeking, Your Honor.  What I'm seeking is, I don't think you

15 can compartmentalize Dr. Filler.  And I saw him testify.

16 He's a professional.  He's an advocate.  You ask him his

17 name, and ten minutes later he's spilling out quite a bit,

18 and it's going to be a challenge for the Court to

19 compartmentalize him, and that's what I worry about.

20        I don't want a continuance.  I just want a fair

21 playing field.  If I'm playing by the rules, I want the

22 other side to.  And I've suffered through this case,

23 seven-hour depositions, every one.

24        Mr. Haysbert, I don't want to go back over it, but

25 there is such a long history of this case, I'm extremely

 1   distrustful, and these late disclosures are perfect evidence

 2   of what we have been going through.  And the suggestion that

 3   Mr. Haysbert is going to be here for trial, that's -- I

 4   believe -- maybe that's his right, I don't know.  The fact

 5   that he's negotiating with these experts.  This is tainted.

 6   It continues to be tainted.

 7        So, no, I really don't want a continuance.  I want

 8   this case over.  I don't want to hear about Dr. Haysbert or

 9   Mr. Haysbert ever again.  I would be very happy.  I have

10   come up for trial now, this is my fourth time coming up for

11   trial in this case.  And trying a case twice, I've done it a

12   couple of times, it's not much fun.  So, no, truly, I don't

13   want a continuance, Your Honor.  You're right.  But I want a

14   fair and level playing field for once.

15        THE COURT:  Let me ask you about Mr. Avrit.  In

16   addition to these timing issues, you talked about

17   foundational issues as well.  Why don't you articulate --

18        MR. McGAVIN:  The floor was dry.  The floor was

19   dry.  I don't know why we're talking about potential

20   condensation when the floor was dry.  There is no foundation

21   for any of this.  Plus, he's now testifying as a

22   meteorologist.  He's now going to tell us based upon review

23   of meteorological data whether or not there is condensation.

24   And Ms. Morgan contacted us previously, within the past

25   month, and said, would you consent that the meteorological

1    data is true and accurate?  No.  We're not doing that.  It

2    was not raining.  The floor was dry.  The witnesses say the

3    floor was dry, independent witnesses, two store employees.

4    Mrs. Haysbert says the floor was dry.  Her clothes weren't

5    wet.  Condensation is moisture.  So, it's totally irrelevant

6    to introduce this issue of condensation to this case, which

7    is moisture, when the floor wasn't even wet.

8         THE COURT:  Well, isn't part of the other problem

9    that his initial report says that the floor was wet because

10   it rained, and his second supplemental report says the floor

11   is wet because of condensation?  I mean, they're

12   inconsistent with each other.

13        MR. McGAVIN:  They're both wrong.

14        But the point is, they saw our objection, and

15   Mr. Haysbert went out and went to Mr. Avrit and said, hey,

16   let's find a new opinion.  And that's what happened.

17   Obviously.  He didn't do this just because.  Ms. Morgan

18   didn't ask him to do it.  Somebody asked him to do it, and I

19   know who.  And I'd love to see the emails, how that all got

20   started.  This is just -- fundamentally, it should be

21   excluded.  He should be excluded for two reasons.  It wasn't

22   raining.  The floor wasn't wet.  And there is no

23   condensation.

24        And that work order that talks about condensation,

25   it's irrelevant.  We're on notice of a condition at the

1   front of the house that didn't apply on the day in question.

2          There would have to be evidence that the floor was

3   wet.  It was not.  Every witness says the floor was dry.

4   So, I strenuously object to Mr. Avrit's testimony.

5          I strenuously object to Dr. Filler's testimony.  I

6   think he's irreparably tainted.  And he's now tried to

7   bolster everything.  He's going to have to come in.  It's

8   going to be a complete nightmare trying to hold him to just

9   what's in his report, his first report.  And we're going to

10  have so many objections, I'm going to be jumping up and down

11  like a jack in the box all over again, which I don't want to

12  do.  I just want to sit there quietly.  Ms. Blake won't be

13  there.  She's going out on maternity leave, so I'm going to

14  be all by myself.  It's going to be a disaster for me,

15  Judge.

16          THE COURT:  Ms. Morgan, let me hear from you.

17          MS. MORGAN:  Thank you.

18          THE COURT:  Let me start with Mr. Avrit because

19  separate from these issues related to Mr. Filler and timing,

20  and I think I've been clear about the timing issue, but to

21  me there has been this other kind of fundamental problem

22  with Mr. Avrit in that you have these second set of opinions

23  that are directly contrary to his first set of opinions and

24  it's a --

25          Do you want to be heard on how you want to proceed

1    on him?

2         MS. MORGAN:  Yes, Your Honor, thank you.

3         I would like to just start talking about the case

4    generally.  I have tried and I will continue to try to

5    change the tenor of this case.  The way that Mr. Haysbert

6    did things is not the way that I do things.  I have

7    practiced in the Eastern District of Virginia for 25 years,

8    and, frankly, I was appalled at some of the things that

9    happened in this case on both sides, so that is not where I

10   am headed.

11        And I can tell this Court that nothing that has

12   been done, at least with respect to me, has been deliberate

13   in any way.  I have an obligation to tell the Court the

14   truth.  I have not been involved in this case for very long.

15   It has taken me a long time to get through the substance of

16   this case.  My involvement has only been on the sanctions

17   and the Bar complaint and related matters.  And it is taking

18   everything I have just to get through some of this data and

19   understand it.

20        And so, you know, I'm a little bit offended about

21   the deliberateness, because that was absolutely not my

22   intent, and I gave the reports as soon as I had them.  And I

23   believe it is appropriate to be penalized in the form of

24   those supplemental reports being excluded.  I think that's

25   fair.  I would expect no less as a defense attorney.

1          In terms of a continuance, this is where we kind of
2    have the same issue.  Now, Mr. McGavin got up here and said,
3    we have complied, we have complied, we have complied.  I
4    don't know that he hasn't complied.
5          If I put Marcus Wilson or Nick Seifert or somebody
6    from Outback or Bloomin' Brands on the stand, it's been a
7    year and a half or a year and four months.  They might say,
8    oh, I no longer work at Outback.  Things have changed
9    because, as the Court commented, lives go on, and there is
10   nothing I can do about that.
11         I don't necessarily want a continuance.  I would
12   love to have more time.  But I think it just opens a can of
13   worms about where we go from here because everybody's lives
14   go on in the case.  So, I'm at a disadvantage from that
15   standpoint as well because I haven't taken supplemental
16   depositions.  I don't know if even the addresses that I have
17   for these witnesses are even correct, so we're all kind of
18   in the same boat, and so I could not advocate for a
19   continuance.  I think we just go forward.
20         So, in terms of Mr. Avrit, I did ask -- like, you
21   know I saw the comment about the floor in his original
22   report.  And I said, well, I don't know if that's enough.
23   Is there a supplemental report?  I thought maybe one had
24   been done, and lo and behold there had been.  I don't think
25   it's much better.  I think it's probably inconsistent, and

1  maybe that's just his thing.  So, I do not intend to call
2  him if the Court will not allow his supplemental report to
3  come in.  I think there is no benefit to doing that.  I see
4  most of his opinions -- and I told Ms. Blake this earlier --
5  as treading on ground that wouldn't even be admissible in
6  the first place.  So, if that's the Court's ruling on that,
7  then I will strike him as an expert witness.
8          I'm trying to streamline this case and make it as
9  seamless as possible, Your Honor.  So, I think that
10 addresses your question about him.
11         I think that, you know, that's really all I have to
12 say.  I think the sanction of not bringing this stuff in is
13 appropriate.
14         I think we'll just have to deal with Dr. Filler.  I
15 mean, I wasn't there.  He did have long dialogues, but he's
16 an expert witness, and he's a very, very, smart man, but
17 we'll figure it out.
18         THE COURT:  What is your understanding of
19 Dr. Haysbert's -- how would you characterize the current
20 status of her treatment relating to the issues that she says
21 were caused by the fall?
22         MS. MORGAN:  I think that the medication Aricept --
23 I'm not sure how you pronounce.  It's referenced on the last
24 page of his report -- I think it's helping.  I don't know
25 that she's a hundred percent, but I do think that there is

1    some indication that it's helping her.

2         THE COURT:  So, just so I am understanding, she is

3    currently on medication that Dr. Filler placed her on?

4         MS. MORGAN:  Correct, yes.  And obviously we'd like

5    to -- I mean, I think that's actually beneficial for the

6    defendants to bring in, you know, but if we don't get to

7    talk about that, then we don't get to talk about it.

8         THE COURT:  I know that the report indicates that

9    there was a Zoom treatment.

10        MS. MORGAN:  Telehealth.

11        THE COURT:  Telehealth appointment.

12        MS. MORGAN:  Yes.

13        THE COURT:  Has she subsequently been seen by

14   Dr. Filler?

15        MS. MORGAN:  Not that I'm aware of.

16        And I just thought about one other thing.  If you

17   remember from the trial transcripts, her physician that she

18   was dealing with, Dr. Chinnery, he passed away.  So, I mean,

19   she -- and she has a traumatic brain injury, and she needs

20   treatment, so, I mean...

21        THE COURT:  Is she seeing any other doctor?

22        MS. MORGAN:  I don't think so, but, again, part of

23   this is I don't know what I don't know on the plaintiff's

24   side, so.

25        THE COURT:  All right.  Do you want to say anything

 1    else?

 2              MS. MORGAN:  No, thank you.

 3              THE COURT:  I'm at some point going to take a brief

 4    recess, so I'm going to put a pin in this for just a moment.

 5    I think I can deal with the other motions fairly quickly, so

 6    I think we should just do that, and then I'm probably going

 7    to take just a brief recess.

 8              Okay.  So, let me, I know we have some associated

 9    exhibits, but I'm going to talk about those I think at the

10    end.

11              There is the defendant's motion regarding corporate

12    indifference.

13              MS. MORGAN:  That's not our trial theory.

14              THE COURT:  All right.  And I'm going to grant

15    their motion.  Frankly, you're not seeking punitive damages.

16    There is nothing you could point to which would indicate

17    that that speaks to any relevance or issue in the case, and

18    so it could only be admitted and used for an impermissible

19    purpose.

20              MS. MORGAN:  I think what I had explained to

21    Ms. Blake was, you know, I can't predict exactly what

22    questions I would ask.  And I told her I thought that if I

23    had somebody from Outback on the stand, I might ask a

24    question like, did anybody follow up with her?  I see that

25    as the very limit of -- you know, I think the answer to that

```
 1    question is no.  The jury can infer whatever they want to
 2    infer from that.
 3            THE COURT:  And that's their motion, and that's
 4    what I am ruling on.
 5            MS. MORGAN:  Okay.
 6            THE COURT:  I am granting their motion, and I'm
 7    excluding that.
 8            MS. MORGAN:  Okay.  So, you don't want me to ask
 9    that question?
10            THE COURT:  Correct.
11            MS. MORGAN:  Okay.
12            THE COURT:  There is a motion regarding internal
13    policies, I think that may be resolved.
14            Is that resolved?
15            MS. BLAKE:  It should be if Bloomin' Brands is
16    dismissed.
17            MS. MORGAN:  Yeah.  We're not trying to establish
18    ownership and control, so... and I think the case law is
19    correct that it doesn't come in.
20            THE COURT:  I agree.
21            All right.  There is the brain map demonstrative
22    and the PowerPoint demonstrative.  I just also want to be
23    clear.  I understand some of these would be implicated by
24    other rulings, but I think it's as helpful as possible for
25    me to clear up as many things and then deal with remaining
```

1    issues, so that's why I am dealing with these two.

2         My understanding is these are -- and there is now a

3    new rule that talks about illustratives or an amendment to

4    Rule 107, those things that help the jury understand the

5    evidence, they are not evidence, they don't go back to the

6    jury.  I don't think my scheduling order addresses things

7    like an opening PowerPoint, a closing PowerPoint, or a

8    PowerPoint that you might use with an expert.  I think in

9    more complicated cases I have the parties disclose them a

10   couple of days in advance so that I can deal with any

11   objections in advance so that we don't have trial issues, so

12   like a couple of days before trial.

13        What's the issue with the brain map demonstrative

14   that currently exists?

15        MS. BLAKE:  The issue is that we have not been

16   provided with any foundation as to where -- I mean, so it's

17   -- I think it's been represented to the Court that these are

18   Dr. Filler's or whoever took the DTI imaging, it is the DTI

19   imaging that has been made into a 3d animation.  But by who?

20   The issue is at the last trial Dr. Filler testified that he

21   had never seen this brain map demonstrative, and all we now

22   have is plaintiff's counsel's representations that now

23   Dr. Filler has seen the demonstrative, and he intends to lay

24   the foundation, but I think that that does then go back to

25   the Court's order froze this case in time.  He's been

1    provided supplemental materials, and now he intends to move

2    things around, and we don't exactly know how.

3          I don't know who this third-party company is.  It's

4    not been disclosed.  I don't know how this was created, or

5    when it was created, and for what purpose it was created.

6    It was just kind of something that was provided to us mid

7    trial.

8          THE COURT:  I'll be frank.  That happens all of the

9    time.  I mean, you have images, they're put into some trial

10   prep by some third-party that deals with attorneys that does

11   this.  I mean, unless there is like an allegation that that

12   imaging or the demonstrative in some way changes the

13   imaging, I mean, that's why -- I mean, typically I would say

14   it needs to be provided slightly in advance of trial so that

15   if there are any issues like that, there is no prejudice, a

16   party can object in advance.  But they can create a

17   demonstrative with those exhibits.  She could do that today

18   for purposes of trial.  I mean, you could do that.  You know

19   you could take some exhibit and make a PowerPoint that you

20   want to walk through with your expert.  I think there is a

21   good reason in this case to have people disclose them early.

22   But it's not an exhibit, it's a demonstrative.  And I guess

23   what I'm saying is on the basis that you say, I'm going to

24   overrule your objection.

25          I am going to require that any demonstratives,

```
 1    PowerPoints that are going to be used, I think it would be
 2    helpful that they be provided in advance.  At least anything
 3    that is to be used with a party, like an expert, I'll have
 4    you produce those.  I was going to do the Wednesday before
 5    our current trial date.  I'll let you meet and confer if you
 6    want to make an agreement regarding PowerPoints for openings
 7    and closing.  Normally, parties don't, or if they do, it's
 8    literally like an hour or two before just so you can look
 9    and make sure there is nothing objectionable.  I have done
10    that in my patent cases.  A case like this, normally parties
11    wouldn't do it.  If you guys want to talk about it and agree
12    to something, that would be fine.
13              And if you think that there is an issue, I mean,
14    obviously I think there will have to be some testimony from
15    Dr. Filler to the demonstrative, that it's the images that
16    he's previously reviewed.  If that doesn't happen and you
17    want to object on that, then I will take that up at the
18    time.
19              The PowerPoint, I guess my question is, does that
20    guidance clarify your objection relating to the PowerPoint?
21              MS. BLAKE:  Unfortunately, no.
22              The PowerPoint contains -- I mean, it's many, many
23    pages long.  There is a lot of treatises in there that I
24    don't think the foundation for the hearsay exception has
25    been laid at any point.  I don't -- again, I understand the
```

```
 1    Court's decision, we can object at trial to maintain those
 2    objections if they're not, but those treatises were not
 3    disclosed in the initial report.  The copies of them,
 4    pursuant to the Rule, weren't provided.  So, that's the main
 5    objection to the PowerPoint as well as the inappropriate
 6    headers.
 7          This is the problem, and I don't want to rehash
 8    over our prior arguments, but with Dr. Filler's report, his
 9    opinion essentially is that Dr. Haysbert's brain imaging is
10    consistent with a number of things, and in his PowerPoint he
11    has that her brain injury is consistent with quite a few
12    symptoms or at least some symptoms -- I don't have them all
13    memorized -- that are not symptoms that she has ever
14    complained of.  And so, at that point we just find it
15    prejudicial to put it up on a screen in front of the jurors.
16          THE COURT:  All right.  So, I mean, I looked at it.
17    I did not look at it in-depth.  I will tell you that my view
18    is, it is not a PowerPoint that I would use for a jury.  I
19    think it's way too much, too much information.  But I'm
20    going to deal with it in the same way, which is that
21    PowerPoints, the brain map demonstratives, anything else
22    that falls into that type of category should be shared with
23    the other party no later than Wednesday before trial.
24          If there are remaining objections, then what I'll
25    have you do is just file a notice with the Court no later
```

1    than close of business that Friday indicating, you know,

2    what's at issue, and forwarding via email to my law clerk

3    the PowerPoints at issue.  The notice should at least

4    identify, you know, defendant objects to pages blah, blah,

5    and blah because they contain whatever, so I can understand

6    what I'm looking at.

7         What I would like, if there are issues, what I

8    would do is, we'd start court a bit early the morning of,

9    and we would go through it, and I'm going to rule on them,

10   you know, that comes out, whatever.  You know, the way this

11   would typically work is if it's like one or two isolated

12   things, then I'm going to rule on those, and I am going to

13   expect you to change the PowerPoint.  If the PowerPoint is

14   infected to such a degree, I certainly might reach the point

15   that I'm like, look, I'm done, we're not using this, and

16   that's how we'll proceed.

17        So, I just wanted to put you on notice that I

18   recognize you've worked on these.  You should be meeting and

19   conferring on them before you file anything with me.  But to

20   me, that's the best way.  These are things that are kind of

21   produced as you get very close to trial, but this avoids

22   having issues that come up right in the middle of trial.

23   All right.

24        MS. MORGAN:  To the degree that it's already been

25   produced we don't need to reproduce it, though, correct,

1    just if there is anything other?

2         THE COURT:  Right.  I mean, if you've produced the

3    brain map demonstrative and this PowerPoint demonstrative,

4    if there are others that have been exchanged and those don't

5    change, I don't think you need to provide them again to the

6    other party.

7         Okay.  That is all, other than this issue with now

8    just Dr. Filler that I believe we need to address; is that

9    right?

10        MS. BLAKE:  I would just, regarding the

11   demonstratives, I am only -- it's a little bit difficult

12   because I think we're all walking into this case -- well,

13   Mr. McGavin definitely has the most experience out of all of

14   us.  But I am aware of the brain map animation and the

15   PowerPoint.  I have those two things.  I am putting it on

16   the record that if there are any other things, I do not know

17   about them, and I would just appreciate that being

18   disclosed.

19        THE COURT:  All right, and I'll order it.  I mean,

20   everyone is at the same deficit I think.

21        Before I take a break, let me just address

22   Mr. Haysbert's involvement generally.  I think that

23   Mr. Haysbert is entitled to observe the trial in this matter

24   as an audience member.  It's an open court.  I don't think

25   it would be proper for me to exclude him.  Well, I think I

1    could exclude him, but I don't think I have done so yet.

2    And I'll just say at this point given the information that I

3    have, I'm not excluding him from trial.  I think he's, as a

4    member of the public, permitted to be present and to

5    observe.

6         I addressed this previously regarding his dual role

7    as a family member to his mother and previous counsel to

8    her.  And my recollection of what I said and what we talked

9    about was, he is, of course, is her, the plaintiff's son.

10   But he made the decision to be her counsel of record and to

11   appear in this case.  He was then subsequently removed from

12   the case, and his *pro hac vice* was revoked.  It is in my

13   view in no way appropriate for him to involve himself in

14   this case in a way in which an attorney would.  He can't

15   represent her related to this case in any way.  He made that

16   decision when he chose to represent her.  And so, he can't

17   now say, well, I'm her son, so I get to do some things as an

18   attorney, but I'm not appearing in court on her behalf.  No.

19   He appeared as counsel of record in this case, and his *pro*

20   *hac vice* was revoked, and the Court ordered him not to be

21   involved as counsel in this case.  That's my understanding

22   of the Court's order.  I could certainly be corrected if I

23   am wrong.

24         And so, I recognize that there could be a line

25   there.  So, for example, I think it's appropriate for a

JILL H. TRAIL, Official Court Reporter

1    child to drive their parent to a medical appointment or even

2    set up the appointment.  It would not be appropriate to

3    communicate with witnesses or experts in the case regarding

4    their testimony and their expert opinions.  That is legal

5    representation.  I don't think there really could be a

6    dispute about that.  I am very concerned that this may be an

7    issue that the Court has to deal with, but I am endeavoring

8    to because he is not currently counsel of record.  So,

9    really the issue, if there were a violation, would be

10   whether or not he's in violation of the Court's order.

11          Now, I recognize Mr. McGavin's point, which is

12   true, that could be separate, but if they've suffered harm

13   as a result of an alleged violation of a court order, then

14   certainly that would be an issue that affects the case.

15   It's somewhat different.  Those are my thoughts on where

16   that stands at this point.

17          I think it would be helpful, I'm going to take a

18   brief recess.

19          Let me ask you all.  Defendants have asked for a

20   continuance.  Do you want an opportunity --

21          Mr. McGavin, Ms. Morgan has put some information on

22   the record regarding the changes, that she's aware of them,

23   although it sounds like there may be some information that

24   she's not aware of.  Would you want the opportunity, for

25   example, in a very short turnaround to have her file

1    initially an update?  So, really this would be, you know, I
2    think she's on medication, if she's obtained any additional
3    treatment, anything that is materially different from her
4    prior testimony, and then if you wanted to articulate your
5    reasoning regarding a new trial?  Do you want that
6    opportunity?  Would you like to see that before I rule on
7    your request for a new trial or a new trial date?
8            MR. McGAVIN:  I don't want a continuance, Your
9    Honor.
10           THE COURT:  Okay.
11           MR. McGAVIN:  I'm just -- I don't know how to
12   comply with the Court's orders and then have Ms. Morgan in
13   the position to say, I don't know what's been going on with
14   Mr. Haysbert.
15           But he is tainting the case, and this is why I
16   think the remedy is -- as I've thought about it over these
17   proceedings -- Mr. Avrit is out.  And essentially, he's out
18   because his opinions were late designated and not supported.
19   But I think Dr. Filler should be out because what happened
20   is in violation of the court order, and that should be the
21   consequence.
22           And I'm left with trying to compartmentalize a key
23   witness who I know is going to be an advocate and he -- what
24   happened there, and Ms. Morgan knew nothing about it, it had
25   to be set up.  Mr. Haysbert was involved, obviously.  He had

1   the report.  She didn't.  And he was running this.  And I
2   think the penalty is he should be out.  I shouldn't have to
3   be up here trying to do the gymnastics of trying to
4   compartmentalize his testimony because what they did so
5   obviously is, he recognized, Mr. Haysbert recognized the
6   weaknesses in that opinion.  Ms. Morgan had nothing to do
7   with it.  And she's being very clear, don't penalize me.
8   You know, I don't know what's going on over there with
9   Mr. Haysbert.  Well, Dr. Filler didn't do a new report
10  because Ms. Morgan asked for it.  And Dr. Haysbert has said
11  she's got a brain injury and can't represent her herself.
12  So, obviously Mr. Haysbert went and said, hey, you got to
13  work up a new report, Dr. Filler, so we can fix all of the
14  problems that Mr. McGavin raised.  And that's wrong.  That
15  violates the court order, and Dr. Filler should be out.
16  That's the penalty.
17          THE COURT:  All right.
18          Ms. Morgan, anything you want to add?  I mean,
19  we've developed a bit, and that's fine.  I appreciate that
20  you're both willing to think on your feet and then make
21  adjustments as we're going through, but I'll give you just a
22  chance if you want to add anything.
23          MS. MORGAN:  I don't really have anything.  I mean,
24  we're just covering the same ground, so...
25          THE COURT:  All right.  Anything else?  I'll take a

1    brief recess.  Anything else you all think we need to

2    address?

3            MR. McGAVIN:  Pardon me, Your Honor.  I was just

4    conferring with Ms. Blake.

5            No, thank you.

6            THE COURT:  Thank you all.  We'll take just a five,

7    ten-minute recess.  Thank you.

8            (Court stood in recess from 12:08 p.m. to

9    12:23 p.m.)

10           THE COURT:  All right.  Thank you all for your

11   patience.

12           I can go ahead and rule on this issue with

13   Dr. Filler.  I am going to exclude Dr. Filler from the

14   trial.  You know, I think it is clear that there was not a

15   timely supplement made to his expert report, and I think I

16   have to consider that in the context of the case in its

17   entirety, as well as the fact that when I consider the

18   prejudice articulated by the defendants, I think that it's a

19   fair point that they're making.  I think they have or would

20   suffer prejudice that I can't entirely address by

21   limitation.  And so given those things, I think that that's

22   an appropriate sanction under Rule 37 is for his exclusion

23   from trial, and so that's the ruling that I will make

24   related to him.

25           I think, then, that deals with all of the motions

1     *in limine*.

2            Let me tell you how we'll deal with the Final

3     Pretrial Order.  There have been a number of, I think,

4     exhibits that have potentially been withdrawn or may be

5     withdrawn based upon my ruling.  Unfortunately, I have a

6     couple of criminal matters I have to take up, and so I don't

7     think I have the time to go through the remaining objections

8     outside of the motions *in limine*, and I think I likely would

9     have reserved on many of those anyway given that most of

10    them are, I think, on foundation or relevance.

11           So, what I'd ask the parties to do is, by the close

12    of business tomorrow, if you could send an email to my law

13    clerk just indicating if there are exhibits or witnesses

14    which you intend to withdraw given the rulings that I have

15    made; that will help us then early next week enter the Final

16    Pretrial Order reflecting those changes without having to go

17    through it right now, and have you all think about those

18    things right now.  And I'd also ask that when you do that,

19    obviously, you need to copy the other side, but if you could

20    also send her a Word version of the proposed Final Pretrial

21    Order.

22           Any questions about that or any --

23           MS. MORGAN:  Yes.

24           THE COURT:  -- exhibits or witnesses you think I

25    especially need to address?

1              MS. MORGAN:  Your Honor, at least for me, for
2    purposes of the record, may I be heard about Dr. Filler and
3    Mr. Nazareth Haysbert?
4              THE COURT:  Go ahead.
5              MS. MORGAN:  Thank you.
6              So, as I understand your ruling, you're excluding
7    Dr. Filler entirely from this trial?
8              THE COURT:  That's correct.
9              MS. MORGAN:  Okay.  I'm just going to raise an
10   objection, respectfully, but he's already testified at this
11   trial, and I think at a minimum what he did was merely
12   follow-up with his patient within a period of four months,
13   which he had set up, not necessarily through Mr. Haysbert
14   but through Dr. Haysbert herself and saw her.  I understand
15   why that should not come in.  But his testimony in total,
16   that is, that is sanctioning the plaintiff for something
17   that she did to treat herself in this case, and now she
18   doesn't have the one person who is treating her at least
19   being able to come in and testify as to the images and
20   everything he did before, that he already testified to?  I
21   think the solution for that could be, Your Honor, is just
22   reading in his testimony from the prior trial, instead of
23   bringing him, and then you compartmentalize it altogether,
24   and you don't go into other areas that are off bounds or
25   anything.  But this, that sanction, perhaps it is within

```
 1    your power of Rule 37 -- I didn't look it up -- but I think
 2    that's a very, very, strong sanction for the plaintiff
 3    simply doing what she had intended to do from the time that
 4    he was engaged in the first place and that she did on her
 5    own without her involvement of her son, by simply following
 6    up.  So, I just would ask that you reconsider that position
 7    or even let me brief if it if possible.  Now, again, the
 8    remedy would just be, let's read in his testimony from
 9    before.  I thought about that earlier.  And I forgot to
10    mention it.
11           Now, in terms of Mr. Haysbert, you indicated that
12    it was in no way appropriate for him to be involved in any
13    way, and I would, again, respectfully disagree with that.  I
14    can brief it, if you wish.  But I understand he's no longer
15    pro hac vice counsel, and he should not do anything related
16    to the court, but he is the only individual who is alive --
17    because Mr. McKelvey passed away -- that I can consult with
18    on things that happened in the prior trial.  I did not try
19    that case.  I was not involved in the trial of that case.
20           So, if there is a witness on the stand -- and I
21    just raise this as way of an example -- and they say
22    something, and I wonder what they said before, and I want to
23    impeach him, he's going to be the fastest source for me to
24    go to and say, hey, do you remember what day or what this
25    person said, and point me to something in the trial
```

1    transcript.  I mean, that's what his role needs to be as

2    former trial counsel.  That is not him being counsel of

3    record in this case.

4            Which I went back and actually looked at the

5    Court's ruling on it and her order, and it didn't say that

6    he couldn't be an attorney for his mom.  It just simply said

7    that she was revoking his *pro hac vice*.  It was very sort of

8    bland in that way.  I don't think it was very specific, and

9    I don't remember exactly what it said, but I did go back and

10   look at it before I even consulted with him, and I felt that

11   I was within the parameters.

12           And I also asked the Bar on this issue as well, and

13   they said, well, he can't, obviously, participate in any of

14   the court proceedings, but he can consult with you, and that

15   was the advice that I was given.

16           So, I just feel like that's too blanket of a

17   statement.

18           THE COURT:  Well, let me clarify my statement.

19           MS. MORGAN:  Okay.

20           THE COURT:  Because I did not intend my statement

21   to be that he could have no involvement with his mother.

22   You specifically talked about this idea of, you know, you

23   speaking with him about his representation, making sure you

24   get the documents, for example, what records does he have,

25   things like that.  I do think that's appropriate.

1          MS. MORGAN:  Okay.

2          THE COURT:  I think that would be necessary for

3    effective representation for you to assume the file.  I do

4    see some difference between that, you know, let me just make

5    sure you have the file and ongoing participation such as you

6    described now, and then separately during the trial.  So,

7    there is kind of two issues which to me would be like an

8    ongoing consultation regarding the development of the trial

9    or the ongoing legal representation and then in court

10   consultation, which is obviously much closer to appearance

11   in this court.

12         MS. MORGAN:  And I'm not saying that I would

13   absolutely have to do that, it just might be the case.

14         THE COURT:  This is not something that I went back

15   and looked at either Judge Smith's rulings or my rulings

16   specifically regarding the limitations.  I mean, it sounds

17   like this may be an issue at trial, and I would rather have

18   it clearly delineated.  I think it's better to have it

19   delineated than not.

20         So, if you'd like to file, really, I think it could

21   be like a five-page brief regarding what you understood the

22   limitations to be and then whether or not there are any

23   rules that would come into play that I would need to

24   consider.

25         MS. MORGAN:  Okay.

```
 1              THE COURT:  But I guess to clarify, to me there is
 2    a difference from representing his mother in unrelated
 3    matters, legal matters.  Certainly, I don't think that was
 4    touched.  That's different from representing her interests
 5    as it relates to this case.  And there could be some overlap
 6    between what one could maybe imagine as like familial
 7    responsibilities and attorney responsibilities, and my point
 8    there was, you can't claim that things that an attorney
 9    could do are now your familial actions and not attorney
10    actions when, for example, you could do them as her attorney
11    on her behalf.  It was that distinction I was trying to
12    draw.
13              MS. MORGAN:  I understand.
14              THE COURT:  I don't think the defense would
15    need -- if you want to respond, you're welcome to.
16              MR. McGAVIN:  We will not respond, Your Honor.
17              THE COURT:  Very well.
18              I'll give you a week to do that.  Is that enough
19    time?
20              MS. MORGAN:  Yes.  I may not.
21              THE COURT:  Very well.
22              MS. MORGAN:  But if I do it, it will be within a
23    week.
24              THE COURT:  All right.  I suspect defense would,
25    regarding the motion to reconsider, you would object to that
```

1    on the bases that you previously stated?

2              MR. McGAVIN:  Yes, Your Honor.

3              And there is no evidence that Dr. Haysbert set this

4    up.  There is no evidence at all.  It's just a -- I don't

5    know.  So, I strenuously object to reconsidering.

6              THE COURT:  Ms. Morgan, your objection is noted.

7              MS. MORGAN:  Thank you.

8              THE COURT:  All right.  So, let me just go through

9    a couple of minor things with you all so we know we're all

10   on the same page.  This will be tried in Newport News.

11   Obviously, we're starting on February 25th.  It's currently

12   set for five days.  If you don't think that it will be five

13   days, please let me know, because I might shift you back one

14   day because I have a criminal trial up until the Monday

15   before.  I anticipate we can keep your date.  It won't be an

16   issue, but I just --

17             MS. MORGAN:  Your Honor, can I address that real

18   quick?

19             THE COURT:  Go ahead.

20             MS. MORGAN:  I do have an issue.  So, if I am not

21   calling Filler and Avrit, I can't get Dr. Haider here until

22   the 27th.  She's coming in the evening of the 26th.  I don't

23   know that I can -- I'm trying to streamline this as much as

24   possible -- I don't know that I can fill two days and then

25   get to her, so...

```
 1              THE COURT:  Do you anticipate, then, that your case
 2     would be tried in two days, meaning if we moved it to
 3     Wednesday, Wednesday and Thursday?
 4              MS. MORGAN:  I think it would take no more than
 5     three.
 6              THE COURT:  All right.
 7              And defense, you anticipate, I think you said
 8     previously, a day?
 9              MR. McGAVIN:  Yes, Your Honor.  I'm trying to think
10     of scheduling.
11              MS. MORGAN:  So, my point, Your Honor, was I would
12     prefer to start a day later, so like if we did wrap up, we
13     would have Haider here.  I don't want us sitting around with
14     nothing to do the afternoon of 26th.
15              MR. McGAVIN:  Your Honor, can I address that?
16              I'm happy to let her testify out of turn.  I would
17     like to keep the current schedule because wrapping over a
18     weekend to come back, it's just more travel for me.  It's
19     another hotel night that I would rather avoid, and I would
20     prefer to keep the current schedule and finish this case
21     within one contiguous week and also not have a jury leave
22     and spend that time.  So, if it means I take Dr. Haider out
23     of turn, I'll do that.  I want to get this done, but I don't
24     want to have to come back over another weekend.
25              THE COURT:  All right.  We'll proceed in that way.
```

1    I do anticipate my other trial should be resolved by Monday.

2    We will start on Tuesday.  With his concession, I think it

3    is preferable to have it dealt with in one week.

4              MS. MORGAN:  And I still have a sentencing on

5    Friday that I had made the Court aware of.

6              THE COURT:  That's not with me?

7              MS. MORGAN:  No.  But it's here in Norfolk.

8              THE COURT:  All right.  And which judge is that

9    with?

10             MS. MORGAN:  It's either -- it's Judge Gibney.

11             THE COURT:  It's Judge Gibney, all right.

12             All right.  My plan is --

13             MS. MORGAN:  I'm sorry.  I misspoke.  It's Judge

14   Allen.  I have two right now.  It's Judge Allen.

15             THE COURT:  All right.  My plan right now would be

16   to generally start at 10:00 a.m. the first day, 9:30

17   thereafter.  If we have things that I think we need to deal

18   with, I may very well say I want you all here at 8:30 or

19   sometime earlier so that we can deal with those before the

20   jury.  My intention would be to have the jury coming in at

21   10:00 a.m.

22             I will tell you that I very often will ask the jury

23   if their preference is, for example, to start early, earlier

24   than, for example, 9:30, like 8:00 or 8:30, we'll start

25   earlier because my goal is to get it done.  I think it is

1    preferable to have it done in one week rather than wrap

2    around as well.

3          I try to take one break in the morning, one in the

4    afternoon, and a lunch break, though typically, I may delay

5    the lunch a bit if we're right in the middle of a witness or

6    something like that.  It's helpful for me if you guys just

7    give me updates about timing so I can make those decisions.

8          We'll seat eight jurors in total.  There will be no

9    alternates.  What I'll do is select initially a panel of 14

10   individuals.  You each get three strikes, and we'll go back

11   and forth starting with plaintiff, meaning your board will

12   have 14 individuals on it.

13         The board will be handed to you, Ms. Morgan.  You

14   strike one, back and forth until you have each struck three,

15   leaving eight individuals.  That's your jury.

16         You've submitted *voir dire*.  I will review it.

17   I'll conduct the *voir dire*.  What I typically do is, if

18   there are sensitive issues, I'll typically let the panel

19   know that they can come forward, and I'll handle it at a

20   sidebar.  Here, occasionally I will ask during that sidebar

21   if the attorneys have additional questions so that if there

22   is some sensitive issue, we can deal with it all at once

23   rather than having that witness come back up.

24         I'll read the witness list for the jury so that

25   they'll know whether they know any of the individuals.

1              I allow the jury to take notes.

2              I will provide preliminary instructions.  I will do

3      jury instructions after your closing arguments.

4              I know you all know this because you have tried

5      cases here, but both of these courthouses are fairly small,

6      and there is a prohibition on any communications with

7      jurors, but just please remind any of your staff, just be

8      careful in the elevators and things like that.

9              Regarding any exhibits, if you do anticipate

10     presenting exhibits in paper form or on an ELMO or through

11     your laptops, do you know?

12             MS. MORGAN:  I like to use the ELMO primarily.

13             THE COURT:  Okay, primarily.

14             Mr. McGavin.

15             MS. BLAKE:  I typically will use the ELMO, but I

16     will also have it on trial pad on my iPad, so I can do

17     either.

18             THE COURT:  All right.  If you're using something

19     other than the ELMO, you need to make sure with IT prior to

20     the day of trial that your equipment is working, and you

21     have the right connections and things that you need for

22     those to present.

23             Understand that my courtroom deputy, if you just

24     throw something up on the ELMO, she's not showing it to the

25     jury unless you have moved to admit it, and which I admit

1    it, and then it will be shown, or it's clear because you're

2    saying this has been previously admitted.  She is not going

3    to know always that an exhibit has already been admitted,

4    and so if it's previously been admitted, you need to say,

5    this has previously been admitted as exhibit whatever, so

6    that she can hit the button to ensure that the jury is

7    seeing whatever you're trying to show.

8          My order requires three paper sets of exhibits, so

9    that's one for the courtroom deputy, the law clerk, and the

10   witness.  My courtroom deputy will essentially be keeping

11   track of what's been admitted so at the end of the trial,

12   after she consults with you, her version can go back to the

13   jury.  I think she would like you to send the exhibit list

14   in a Word document as well, so that she can make any

15   modifications as we're going along.

16         I think I said this before, but I will tell the

17   jury, but it is an area of confusion, that any of these like

18   PowerPoints or your opening statements, if you use a

19   PowerPoint, those things are not going to go back to the

20   jury.

21         I think you all had previously moved to exclude

22   witnesses, and that motion would still be the case.  I see

23   some nodding heads.

24         MS. MORGAN:  I wasn't here but, yes, that would be

25   a motion.

1          THE COURT:  That motion will be granted, and the

2     witnesses will be excluded.

3          I take it from Ms. Morgan's statement that you

4     understand that we will be moving along, and the expectation

5     is unless prior arrangements are made with opposing counsel

6     and the Court that you need to have all of your witnesses

7     ready to go.  The goal is to efficiently try this case so

8     we're not keeping the jury unnecessarily long.

9          And it is my practice, I mean, I understand that

10    everyone would like to take more breaks, but I'm just trying

11    to get the case tried, and we're going to power through it.

12         Your phones are coming in with the pouches.  Those

13    will be opened if you request, but if you want anything

14    else, just submit your electronics form so that I can review

15    that.

16         I think that is everything you would need to know

17    that's a bit different regarding how we will conduct trial.

18         Do you have any questions, Ms. Morgan?

19         MS. MORGAN:  No, Your Honor.

20         THE COURT:  All right.

21         Mr. McGavin?

22         MR. McGAVIN:  No, thank you, Your Honor.

23         THE COURT:  All right.  Well, thank you all for

24    being here.  I appreciate it.  And I look forward to

25    receiving those couple of additional things we talked about.

```
 1              Thank you all.  We'll stand in recess.

 2              (Proceedings concluded at 12:44 p.m.)

 3

 4                        CERTIFICATION

 5

 6         I certify that the foregoing is a correct transcript

 7    from the record of proceedings in the above-entitled matter.

 8

 9

10              _____/s/_____

11                        Jill H. Trail

12                        January 21, 2025

13

14

15

16

17

18

19

20

21

22

23

24

25
```